UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RHONDA HEHRER, as Personal Representative
of the Estate of JOSEPH HEHRER, deceased,

                    Plaintiff,

v.

CLINTON COUNTY, CLINTON COUNTY
SHERIFF LAWRENCE JERUE, JAIL
ADMINISTRATOR THOMAS WIRTH,
SERGEANT SARAH FAGGIONS,
SERGEANT JAMES BURDICK, SERGEANT
CHAD BASHORE, SERGEANT RICHARD
STOUT, OFFICER COREY BECKER,
OFFICERS JANE DOES 1-2, OFFICERS JOHN
DOES 1-5, ADVANCED CORRECTIONAL
HEALTHCARE, INC, DARYL TYRONE
PARKER, MD, JOSEPH W. MASHNI, MD,
WENDY LYNN FREED, LPN, DAWN
THELEN, LPN, EDWARD W. SPARROW
HOSPITAL ASSOCIATION, KIMBERLEE
CHESNEY, MD, WENDY EMBS, RN,
AMARILY MENDEZ, RN, jointly and severally,

                    Defendants.

Case No.:

Hon.:

**COMPLAINT AND
DEMAND FOR JURY
TRIAL**

_____/

KARA E. WEISMAN (P80837)
JORDAN S. VAHDAT (P79237)
VAHDAT WEISMAN LAW
Counsel for Plaintiff
17197 N. Laurel Park Drive, Suite 500
Livonia, Michigan 48152

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

(734) 469-4994; Fax: (313) 451-9719
kara@thevwlaw.com
_____/

*There is no other pending or resolved civil action arising out of the same transaction or occurrence alleged in this Complaint.*

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, RHONDA HEHRER, as Personal Representative of the Estate of JOSEPH HEHRER, deceased, by and through her attorneys, VAHDAT WEISMAN LAW, and for her Complaint against Defendants states as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction over the 42 USC § 1983 claims alleged in this complaint pursuant to the provisions of Title 28 of the United States Code, Sections 1331 and 1343, and also has pendent jurisdiction over all state claims that arise out of the nucleus of operative facts common to Plaintiff's federal claims pursuant to 28 U.S.C. § 1367.

2.     Venue lies in the Western District of Michigan pursuant to 28 U.S.C. § 1391(b). The unlawful actions alleged in this complaint took place within the City of Saint Johns, Clinton County, Western District of Michigan.

3.     That each and every act or omission of Defendants, Clinton County, Clinton County Sheriff Lawrence Jerue, Jail Administrator Thomas Wirth, Sergeant Sarah Faggions, Sergeant James Burdick, Sergeant Chad Bashore, Sergeant Richard Stout, Officer Corey Becker, Officers Jane Does 1-2 and Officers John Does 1-5,

(hereinafter "Clinton County Defendants") as set forth herein, were done by those Defendants under the color and pretense of the statutes, ordinances, regulations, laws, customs, and usages of the State of Michigan, and by virtue of, and under the authority of, each individual Defendants' employment with the State of Michigan.

4.     That each and every act or omission of Defendants, Daryl Tyrone Parker, M.D., Joseph W. Mashni, M.D., Wendy Lynn Freed, L.P.N., Dawn Thelen, LPN, and Advanced Correctional Healthcare, (hereinafter "ACH Defendants") as set forth herein, were done by those Defendants under the color and pretense of the statutes, ordinances, regulations, laws, customs, and usages of the State of Michigan, and by virtue of, and under the authority of, each individual Defendants' employment with the State of Michigan.

5.     That this court has pendent jurisdiction over all state claims against Defendants that arise out of the nucleus of operative facts common to Plaintiff's federal claims pursuant to 28 U.S.C. §1367.

6.     That the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of costs, interest, and attorney fees.

## PARTIES

7.     Plaintiff, Rhonda Hehrer (hereinafter "Plaintiff") is the lawfully appointed Personal Representative for the Estate of Joseph Hehrer, deceased (hereinafter "Mr. Hehrer").

3

8.      At all times relevant, Mr. Hehrer was a resident of the County of Clinton, State of Michigan and was entitled to all the rights, privileges, and immunities accorded to all U.S. citizens and residents of Clinton County and the State of Michigan.

9.      At all times relevant, Plaintiff, Rhonda Hehrer, was and is a resident of the City of Ovid, County of Clinton, State of Michigan.

10.      At all times relevant, Defendant Clinton County was and is a political subdivision duly incorporated under the laws of the State of Michigan, and is the body responsible for the control and oversight of its departments, agencies and facilities, including the operation and staffing of the Clinton County Sheriff Department and the Clinton County Jail, with said operating and staffing including the organization, training, operation and discipline of staff correctional officers and medical and mental health personnel at that facility, including Clinton County Defendants and ACH Defendants.

11.      At all times relevant, Defendant Sheriff Lawrence Jerue (hereinafter "Jerue"), resided in the County of Clinton, State of Michigan, and was the duly elected Sheriff of Clinton County. Jerue was a policy maker for the Clinton County Jail and represented the ultimate repository of law enforcement power in the Clinton County Jail.  Jerue was responsible for the supervision and oversight of Clinton County Jail Employees including, but not limited to Sergeants and Officers. As

4

Clinton County Sheriff, Jerue exercised administrative, command, fiscal and policy making authority over the Clinton County Sheriff Department, and at all times herein was acting under color of state law. Jerue was acting within the scope of his employment and under the color of State law and is being sued in his official capacity as a policy maker and Sheriff of Clinton County.

12.    As the Clinton County Sheriff, Defendant Jerue, was employed by statute to protect the lives and property of Clinton County citizens by enforcing State laws and local ordinances, investigating crimes, and detaining inmates remanded to the Clinton County Jail in a manner which maintains the highest degree of professional excellence, integrity, and courtesy. His duties also included performing law enforcement, jail and support missions in a humane manner which reflects sensitivity to the dignity and equal rights of all citizens and reinforces the values of the community. These duties further included addressing misconduct and discipline of the sergeants, officers, and medical staff working within the Clinton County Jail.

13.    At all times relevant, Defendant, Jail Administrator Thomas Wirth (hereinafter "Wirth"), upon information and belief, resided in the County of Clinton, State of Michigan, and was and is employed by the Clinton County Sheriff Department as the Jail Administrator of Corrections. Wirth is a supervisor and a policy maker for the Clinton County Jail. Wirth was acting within the scope of his

5

employment and under the color of State law and is being sued in his official capacity as a policy maker and Jail Administrator of Corrections.

14. At all times relevant, Defendant, Sergeant Sarah Faggions (hereinafter "Faggions"), upon information and belief, resided in the County of Clinton, State of Michigan, and was and is employed by the Clinton County Sheriff Department and as a Sergeant was responsible for supervising officers and jail medical staff, including the individual Defendants, Officer Corey Becker, Officers Jane Does 1-2, Officers John Does 1-5, and ACH Defendants. Faggions was acting within the scope of her employment and under the color of State law and is being sued in her individual and official capacity.

15. At all times relevant, Defendant, Sergeant James Burdick (hereinafter "Burdick"), upon information and belief, resided in the County of Clinton, State of Michigan, and was and is employed by the Clinton County Sheriff Department and as a Sergeant was responsible for supervising officers and jail medical staff, including the individual Defendants, Officer Corey Becker, Officers Jane Does 1-2, Officers John Does 1-5, and ACH Defendants. Burdick was acting within the scope of his employment and under the color of State law and is being sued in his individual and official capacity.

16. At all times relevant, Defendant, Sergeant Chad Bashore (hereinafter "Bashore"), upon information and belief, resided in the County of Clinton, State of

Michigan, and was and is employed by the Clinton County Sheriff Department and as a Sergeant was responsible for supervising officers and jail medical staff, including the individual Defendants, Officer Corey Becker, Officers Jane Does 1-2, Officers John Does 1-5, and ACH Defendants. Bashore was acting within the scope of his employment and under the color of State law and is being sued in his individual and official capacity.

17. At all times relevant, Defendant, Sergeant Richard Stout (hereinafter "Stout"), upon information and belief, resided in the County of Clinton, State of Michigan, and was and is employed by the Clinton County Sheriff Department and as a Sergeant was responsible for supervising officers and jail medical staff, including the individual Defendants, Officer Corey Becker, Officers Jane Does 1-2, Officers John Does 1-5, and ACH Defendants. Stout was acting within the scope of his employment and under the color of State law and is being sued in his individual and official capacity.

18. At all times relevant, Defendant, Officer Corey Becker (hereinafter "Becker"), upon information and belief, resided in the County of Clinton, State of Michigan, and was and is employed by the Clinton County Sheriff Department as an Officer, and was acting under the color of State law and in the course and scope of his employment at the Clinton County Jail, and is being sued in his individual capacity.

19.    At all times relevant, Defendants, Officers Jane Does 1-2, whose identities are currently unknown, upon information and belief, resided in the County of Clinton, State of Michigan, and were and are employed by the Clinton County Sheriff Department as Corrections Officers, and were acting under the color of State law and in the course and scope of their employment at the Clinton County Jail, and are being sued in their individual capacities.

20.    At all times relevant, Defendants, Officers John Does 1-5, whose identities are currently unknown, upon information and belief, resided in the County of Clinton, State of Michigan, and were and are employed by the Clinton County Sheriff Department as Corrections Officers, and were acting under the color of State law and in the course and scope of their employment at the Clinton County Jail, and are being sued in their individual capacities.

21.    At all times relevant, Defendant, Advanced Correctional Healthcare, Inc. (hereinafter "ACH"), was and is an Illinois corporation, doing business in Clinton County, and contracted with Clinton County to provide medical services to inmates at the Clinton County Jail and is the entity responsible for the control and oversight of the operation and staffing of medical personnel and facilities at Clinton County Jail, including the organization, hiring, training, operation, supervision, retention and discipline of medical staff personnel at Clinton County Jail and the medical training of Clinton County correctional employees.

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

22.     At all times relevant, Defendant Daryl Tyrone Parker, M.D. (hereinafter "Dr. Parker"), upon information and belief, was a resident of the State of Michigan, and was and is a licensed physician, practicing within the medical specialty of internal medicine, employed by Clinton County, Clinton County Jail and/or ACH, and was acting under the color of state law and in the course and scope of his employment with Clinton County, Clinton County Jail, and/or ACH, and is being sued in his individual capacity.

23.     At all times relevant, Defendant Joseph W. Mashni, M.D. (hereinafter "Dr. Mashni"), upon information and belief, was a resident of the State of Michigan, and was and is a licensed physician, practicing within the medical specialties of internal medicine and urology, employed by Clinton County, Clinton County Jail and/or ACH, and was acting under the color of state law and in the course and scope of his employment with Clinton County, Clinton County Jail, and/or ACH, and is being sued in his individual capacity.

24.     At all times relevant, Defendant Wendy Lynn Freed, L.P.N. (hereinafter "Nurse Freed"), upon information and belief, was a resident of the State of Michigan, and was and is a licensed practicing nurse employed by Clinton County, Clinton County Jail and/or ACH, and was acting under the color of state law and in the course and scope of her employment with Clinton County, Clinton County Jail, and/or ACH, and is being sued in her individual capacity.

25.     At all times relevant, Defendant Dawn Thelen, L.P.N. (hereinafter "Nurse Thelen"), upon information and belief, was a resident of the State of Michigan, and was and is a licensed practicing nurse employed by Clinton County, Clinton County Jail and/or ACH, and was acting under the color of state law and in the course and scope of her employment with Clinton County, Clinton County Jail, and/or ACH, and is being sued in her individual capacity.

26.     At all times relevant, each Clinton County Defendant and ACH Defendant were employees/agents of Clinton County and/or the Clinton County Jail, engaging in the exercise of a governmental function and conduct within the course, scope and authority of his/her/their employment/agency with Clinton County and/or the Clinton County Jail.

27.     At all times relevant, Defendant Edward W. Sparrow Hospital was and is a Michigan Nonprofit Corporation that conducts continuous and systematic business at various locations throughout the State of Michigan, including but not limited to, Clinton County.

28.     At all times relevant, Defendant Kimberlee Chesney, M.D. ("Dr. Chesney"), was a resident of the State of Michigan, and was and is a licensed physician, practicing within the medical specialty of emergency medicine, employed by Edward W. Sparrow Hospital Association and is being sued in her individual capacity.

10

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

29.     At all times relevant, Wendy Embs, RN ("Nurse Embs"), was a resident of the State of Michigan, and was and is a registered nurse, practicing within the nursing specialty of emergency medicine, employed by Edward W. Sparrow Hospital Association and is being sued in her individual capacity.

30.     At all times relevant, Amarily Mendez, RN ("Nurse Mendez"), was a resident of the State of Michigan, and was and is a registered nurse, practicing within the nursing specialty of emergency medicine, employed by Edward W. Sparrow Hospital Association and is being sued in her individual capacity.

31.     The acts set forth in this Complaint arise under Section 1 of the Civil Rights Act of 1871, 17 stat. 13, 42 U.S.C Sec. 1983 in the Eighth and Fourteenth Amendments to the United States Constitution, unless the cause of action indicates that it arises under the laws of the State of Michigan, in which case the court has supplemental or pendent jurisdiction.

## STATEMENT OF FACTS

32.     That on or about March 23, 2017, Defendants ACH and Clinton County and/or Defendant Jerue, signed a health services agreement in which ACH would provide correctional healthcare services to inmates lodged in the Clinton County Jail.[1]

---

[1] Exhibit 1: Agreement for the Provision of Inmate Health Services, Clinton County, Michigan, 03/22/17; (hereinafter "The Contract")

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

33.    That in exchange for approximately $179,188.97 annually, Defendant, ACH, would provide staffing coverage as requested by the Sheriff, including but not limited to, licensed practical nursing coverage and a physician and/or mid-level practitioner coverage.

34.    That The Contract between Defendants ACH and Clinton County and/or Defendant Jerue, states in relevant part:

    a.  ACH would provide health education material to the Sheriff for inmate education, on-site health evaluations and medical care for inmates, and in cases of emergency medical treatment, ACH would stabilize all patients and refer for recommended treatment or care, as needed.

    b.  ACH would maintain or require being maintained complete and accurate medical records for each inmate who received healthcare services.

    c.  A complete copy of the original applicable medical record will be available to accompany each inmate who was transferred from the Clinton County Jail to another location for off-site services or transferred to another institution.

    d.  A physician and/or mid-level practitioner will be available by telephone to the Clinton County Jail and medical staff on an on-call basis, seven (7) days per week, twenty-four (24) hours per day.

e. The duty to train the Clinton County Jail Staff is vested in the Sheriff. Upon request of the Sheriff, ACH may assist in training for Clinton County Jail staff on certain topics as determined by the Sheriff.

f. ACH will retain full responsibility for the performance of acts under The Contract and any subcontractors.

35.   On January 18, 2019, Mr. Hehrer was involved in a motor vehicle accident at or near East Colony Road and North Chandler Road, Clinton County, Michigan. He was the driver of the motor vehicle, which ran off the road into a ditch, injuring himself and his front-seat passenger.

36.   Upon arrival at the scene, Deputy Kyle Foerster, Ms. Nicki Zarzyski and Sergeant Daniel Spitzley of the Clinton County Sheriff's Department found Mr. Hehrer in a state of unresponsiveness and noted that his breathing was labored and shallow.

37.   Clinton Area Ambulance Service Authority Emergency Medical Services arrived shortly thereafter and reported that Mr. Hehrer had very constricted pupils that were unresponsive to light.

38.   Mr. Hehrer was unconscious but with pulse and respirations.

39.   Ultimately, Mr. Hehrer was intubated nasotracheally and transported to Sparrow Clinton Hospital.

13

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

40.     In the Emergency Department at Sparrow Clinton Hospital, Mr. Hehrer was evaluated and/or treated by Dr. Kimberlee Chesney, M.D.,Wendy Embs, R.N., and Amarily Mendez, R.N.

41.     Mr. Hehrer was evaluated for multiple traumatic injuries and resuscitated with intravenous fluids. Over the course of his treatment in the Emergency Department, his condition improved as he became alert and oriented to person, place, time, and purpose. Diagnostic studies revealed the presence of elevated plasma glucose (275 mg/dL) and urinary glucose.

42.     Despite these findings, Mr. Hehrer's attending medical staff, including, but not limited to, Dr. Kimberlee Chesney, M.D., Wendy Embs, R.N., and Amarily Mendez, R.N., failed to inform Mr. Hehrer of this abnormality, or instruct Mr. Hehrer relative to proper follow-up care for hyperglycemia.  Mr. Hehrer was prescribed no medication for this condition and was only instructed to follow-up "as needed" with a family medicine physician.

43.     Mr. Hehrer was issued a misdemeanor citation for operating under the influence of drugs second offense and failure to wear a seatbelt.

44.     On January 23, 2019, Mr. Hehrer was arrested by Clinton County Sheriff Deputies and booked as inmate 68391 into the Clinton County Jail for a probation violation and DUI related to the motor vehicle accident on January 18, 2019.

14

45.     As a result of Mr. Hehrer's DUI, he was issued a $500 cash or surety bond in the Clinton County District Court by Magistrate Nicole Maneval. However, due to Mr. Hehrer's probation violation, Judge Michelle Rick in the Clinton County Circuit Court issued a no bond.

46.     Upon Mr. Hehrer's arrival to the Clinton County Jail, Officer Debra Lott completed a Jail Medical Screen History Report at 1551 hours on January 23, 2019. Having not been told of the elevated plasma and urinary glucose, Mr. Hehrer answered negatively to the questions: "Do you have a history of . . . diabetes . . . ?" and "Are you currently on any medications, for any reason?"

47.     Carelessly and incomprehensibly, when noting whether or not Mr. Hehrer's skin was free of vermin, Officer Lott simply wrote "n" and then "oops."

48.     On the afternoon of February 5, 2019, Defendant Wendy Freed, L.P.N. reviewed Officer Lott's Jail Medical Screen History Report and completed a Medical History and Health Appraisal. Defendant Nurse Freed noted Mr. Hehrer's weight on this date as 128 pounds and vital signs: BP 106/76; P 61; R 16; T 98.8° F; SpO$_2$ 99%. Defendant Nurse Freed noted that Mr. Hehrer was alert and oriented x 3 with normal speech and cooperative and calm. Defendant Nurse Freed also noted he had no history of diabetes. Nurse Freed made no referrals to a physician on this date. Clinton County Jail contracted Defendant Dr. Parker countersigned this Medical History and Health Appraisal form but failed to date his signature.

15

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

49.     On or about March 1, 2019, Mr. Hehrer began exhibiting signs of illness.

50.     On or about March 4, 2019, Mr. Hehrer called his sister stating, "I've been sick as fuck since Friday," "my body's weak as shit" and "I can't hold any food down."

51.     Mr. Hehrer further stated, "I went and seen a nurse [sic], but they wanted to charge a shit load for meds, so I'm just going to fight it out."

52.     On March 5, 2019, Mr. Hehrer submitted a sick call request to jail staff complaining of "Fever, queasiness, headaches in and out, heartburn constantly throughout the day; have puked a couple times."

53.     On March 5, 2019, Mr. Hehrer purchased three 2-packs of ibuprofen from commissary.

## March 6, 2019

54.     On March 6, 2019, at approximately 0032 hours, Officer Hungerford notated that Mr. Hehrer was moved from "M Dorm" to ". . . recv 4, 3" for medical observation.

55.     At 0900 hours on March 6, 2019, Mr. Hehrer was seen and evaluated by Defendant Nurse Freed. Mr. Hehrer's subjective complaints were noted as: "1. Haven't been able to hold things down since Saturday [3/2/19]. 2. Patient brought

to medical Rec per officers." His vital signs were documented as: BP 142/86; P 96; R 18; T 96.2° F; $SpO_2$ 98%; and weight 114.2 lbs.

56.     Objective findings on physical examination included the following: [Mr. Hehrer] states having [nausea vomiting] "since 3/2/19 Saturday." Contrary to Mr. Hehrer's previous recorded statements, Defendant Nurse Freed noted that Mr. Hehrer never kited medical "cause I'm not that sick. I just wanted to sleep a lot." Pt states appetite is good, and he states he eats all extra trays when available at mealtimes. Complaining of heartburn "the past several days." States bowels "are good." States last [nausea] vomiting last night at 11 pm. Denies any this am. Patient requesting to go back to gen[eral] pop[ulation].

57.     At 0930 hours on March 6, 2019, Defendant Nurse Freed discussed the above matter with Defendant Dr. Parker. Defendant Dr. Parker ordered: 1) continue on medical observation; 2) daily weights; 3) Zofran 8 mg p.o. q.d. to b.i.d. x 3 days; 4) Omeprazole 20 mg p.o. q.d. p.r.n.; 5) increase fluids and rest; 6) notify medical when merited. Nurse Freed then documented that Mr. Hehrer will see Defendant Dr. Parker on the next clinic day. Defendant Dr. Parker countersigned the Medical Progress Note but failed to date his signature.

58.     At 1800 hours on March 6, 2019, Defendant Dr. Parker saw and evaluated Mr. Hehrer at Clinton County Jail. In his handwritten Medical Progress Note for this date, Defendant Dr. Parker noted that Mr. Hehrer had suffered nausea

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

and vomiting for four (4) days and had lost fourteen (14) pounds since February 5, 2019. No updated vitals appear on the Medical Progress Note for that evening.

59.     Despite medical records showing that Mr. Hehrer had rapid weight loss, continued nausea and vomiting for four (4) days and a low temperature of 96.2 degrees that morning, nearly one (1) degree away from rendering Mr. Hehrer hypothermic, Mr. Hehrer was removed from medical observation and returned to "M Dorm" at 2026 hours.

### March 7, 2019

60.     On March 7, 2019, despite Mr. Hehrer being returned to "M Dorm" from medical observation, video surveillance shows multiple inmates showing concern for Mr. Hehrer and checking on him throughout the day.

61.     At approximately 1830 hours, an inmate immediately flagged down Defendant Officer John Doe as soon as he walked into the M dorm and took him to Mr. Hehrer's cell. Multiple inmates then engaged in conversation with Defendant Officer John Doe until he spoke with Mr. Hehrer.

62.     As soon as Defendant Officer John Doe left M dorm, Mr. Hehrer lifted up his shirt to show his fellow inmates multiple quarter-sized blisters on his back that had the presence of pus.

63.     In addition to blisters, Mr. Hehrer also had deep yellow bruises on his body that were alarming to other inmates.

64.    At approximately 2012 hours, Mr. Hehrer grabbed a trash can and walked back to his cell with another inmate.

65.    At approximately 2015 hours, nearly two hours after inmates had approached Defendant Officer John Doe with obvious concern for Mr. Hehrer, Mr. Hehrer and another inmate went to retrieve Defendant Officer John Doe. Shortly thereafter, Mr. Hehrer was transferred back to medical observation.

66.    At 2022 hours, Defendant Officer Jane Doe walked past Mr. Hehrer's cell as he visibly and noticeably vomits. Defendant Officer Jane Doe did nothing.

67.    At 2024 hours, log notes indicate that Mr. Hehrer was moved from "M dorm" to " . . . recv 2,1."

68.    At 2048 hours on March 7, 2019, an "informational" incident report (# 19-00034) was completed by Officer Cyle Perrien (19752), and recorded by Defendant Sergeant Stout in the log notes at approximately 2108, noting the following:

> On the above date while conducting a round, Officer Roy was approached by inmate Mr. Hehrer, Joseph at approximately 1820 hrs. Inmate Mr. Hehrer stated he has been throwing up. Inmate Mr. Hehrer stated he did not want to go up front. At approximately 2030 hours inmate Mr. Hehrer came to control center and spoke to Officer's Perrien and VanDeusen. Inmate Mr. Hehrer stated his kidneys hurt, it hurt to pee, he was having stabbing pain and that he couldn't keep down any food or water. Officer VanDeusen called Sgt Stout and advised him of inmate Mr. Hehrer's symptoms. Inmate Mr. Hehrer was escorted up to Receiving by Officer VanDeusen.

Inmate Mr. Hehrer was brought up to booking. His vitals were: 100 bpm, 110/78 BP, 98.4 temp. Mr. Hehrer appeared to be fine, no sweating or showing signs of pain. Officer Perrien stated she found that meds for anti-nausea, heartburn, and a few other meds were ordered for Mr. Hehrer yesterday for the same symptoms. Due to not having a protocol sheet for this particular situation, she called a Dr.

Dr. [Joseph W.] Mashni answered at 2030. After hearing the symptoms and vitals, his orders were to give 8 mg of Zofran from stock, tell Mr. Hehrer to drink plenty of water, and if the nausea goes away in a hour or two to give 2 Tylenol. Mr. Hehrer was given 8 mg Zofran and placed in REC-1 for OBS.

69.     At 2229 hours, Defendant Officer Jane Doe opened Mr. Hehrer's cell door, walked inside to bring him toilet paper and allowed him to change out his substandard mattress.

70.     From approximately 2240 hours to 2339 hours, video surveillance shows the cage remained unstaffed while Mr. Hehrer and inmates in observation and/or holding were unmonitored.

71.     At 2342 hours, an inmate walked by Mr. Hehrer's cell and banged on the window to check on him. This same inmate immediately looked back to talk with Defendant Officer John Doe, showing obvious concern and dissatisfaction with Defendant Officer John Doe.

## March 8, 2019

72.    At approximately 0700 hours, Defendant Nurse Freed appeared on camera.

73.    At 0733 hours, despite Mr. Hehrer being removed from "M Dorm" and into Medical Observation the previous night, Defendant Nurse Freed walked by Mr. Hehrer's cell without checking on him.

74.    Despite Mr. Hehrer remaining in the same medical observation cell, log notes from March 8, 2019 at 0844 hours show that Mr. Hehrer moved from " . . . recv 2,1 to New Cell Location . . . recv, 1."

75.    At approximately 0852 hours until 0855 hours, while Defendants Officer Jane Does 1-2 and Defendants Officer John Does 1-5 leisurely conversed in the cage, while video surveillance shows Mr. Hehrer distressed and vomiting.

76.    At approximately 0914 hours, Mr. Hehrer banged on the door, begging for help.

77.    At approximately 0916 hours, Mr. Hehrer collapsed onto his mattress and appeared defeated and lifeless.

78.    At 0936 hours, Defendant Nurse Freed finally made her way to assess Mr. Hehrer.

79.    At 1000 hours on March 8, 2019, Defendant Nurse Freed completed a Medical Progress Note, noting the following:

Subjective Complaint:
1) patient brought to medical Rec. last night per officers 3/7/19 due to patient approached an officer and stated he was throwing up.

Vitals: BP 121/85; P 113; R 18; T 96.7; SpO$_2$ 96%; weight 110

Objective:
Eye: PERRLA
Lungs/Chest: [no shortness of breath]
Abdomen: soft
Genito-Urinary: states having trouble peeing
Skin: warm and dry
Neuro: A+O x 3; [increased] anxiety
Assessment:
Pt states it's his birthday and he would like to spend it "at home or at the hospital." States appetite is "poor" didn't eat supper last night cause "I didn't like the nachos." Pt states "I'm throwing up blood and it's in the drain." [No] blood noted in drain on floor, vomiting unwitnessed. Requesting ice chips, officer notified.

3/8/19 0945 Dr. Parker notified. Zofran 8 mg p.o. b.i.d. x 3 days. Continue Prilosec 20 mg p.o. q.d. Obtained CBC, CMP today. Pt will need to continue in medical observation.

Follow-up: daily p.r.n.

Patient Education: [increase] rest [increase] fluids

80.     Both Defendant Nurse Freed and Defendant Dr. Parker signed the

Medical Progress Note but neither dated their signature.

81.     Upon information and belief, even though Mr. Hehrer requested ice chips and Defendant Nurse Freed allegedly notified Defendant Officer Jane Doe and/or Defendant Officer John Doe of his request, Mr. Hehrer never received them.

82.     At 1000 hours on March 8, 2019, Defendant Nurse Freed handwrote the following Narrative Progress Note:

> Labs per order obtained left [antecubital] space x 1 attempt. Pt tolerated well. Specimen labeled and placed in refrigerator for pick up. Spoke [with] administration about monitoring pt's intake.

83.     Further, the same Narrative Progress Note indicates that Mr. Hehrer told Defendant Nurse Freed that he was vomiting blood.

84.     At approximately 1045 hours, Mr. Hehrer began vomiting again. Mr. Hehrer continued to vomit multiple times over the next couple of hours.

85.     At approximately 1220 hours, Defendant Officer John Doe simply stood outside Mr. Hehrer's cell while Mr. Hehrer vomited. Only one minute later, at 1221 hours, Defendant Nurse Freed looked into Mr. Hehrer's cell, observed Mr. Hehrer vomiting and merely walked away.

86.     At 1317 hours, blatant disregard for Mr. Hehrer's deteriorating health is further shown as Defendant Officer John Doe, who is aware of Mr. Hehrer's declining condition, was observed spinning around in his chair, clearly unconcerned about Mr. Hehrer or any other Clinton County Jail Inmates.

23

87.     At 1400 hours, Defendant Nurse Freed handwrote Narrative Progress Note and documented the following:

> Pt refusing breakfast and refused lunch. States "I don't like the food." Pt also states "I'm ok can I go to the back." Explained to patient Doctor requesting medical observation. Will cont[inue] to monitor.

88.     Even though Defendant Nurse Freed witnessed Mr. Hehrer vomiting hours earlier, she failed to record this observation in her notes.

89.     At approximately 1408 hours, despite Mr. Hehrer being in medical observation, Defendant Nurse Freed walked by his cell twice and failed to look in and/or check on him.

90.     At 1430 hours, Defendant Nurse Freed handwrote another entry in the Narrative Notes: "Pt been resting on mat with eyes closed. Will cont[inue] to monitor status for changes."   Defendant Dr. Parker countersigned the Narrative Progress Notes but failed to date his signature.

91.     Again, despite observing Mr. Hehrer vomit hours earlier, Defendant Nurse Freed failed to document that she had witnessed Mr. Hehrer vomiting in her Narrative Notes.

92.     At 1830 hours, despite Mr. Hehrer being placed in medical observation and away from the general inmate population, Defendant Officer Jane Doe placed another inmate in the small observation cell with Mr. Hehrer.

VAHDAT WEISMAN LAW — Attorneys & Counselors at Law

a. When Mr. Hehrer's cellmate was placed in the cell with him, the cellmate noticed that Mr. Hehrer was jaundiced, had watery eyes, and had rosy ears and cheeks.

b. Mr. Hehrer's cellmate observed him puking blood and attempted to get him help.

c. When the cellmate attempted to get Mr. Hehrer help, Mr. Hehrer told him that the Clinton County Defendants and/or ACH Defendants already knew because he had been sick for a few days and the Defendants did not care.

d. That upon information and belief, it was against Clinton County Jail policies and procedures to place inmates in a medical observation cell with other inmates, however, Clinton County Defendants established a custom, policy, or procedure by making intentional decisions to combine inmates in medical observation cells, inevitably forcing inmates to sleep on the floor and/or to be exposed to unknown diseases and/or health risks.

93. At approximately 1831 hours, Mr. Hehrer's family attempted to visit him for his birthday, but Officer Schneider told them that Mr. Hehrer could not have visitors because he was under medical observation and had been puking for two days.

25

94.   At approximately 2026 hours, Mr. Hehrer vomits again.

95.   At approximately 2048 hours, Defendant Officer John Doe finally entered Mr. Hehrer's cell with the medication chart. Mr. Hehrer then pointed to the drain and Defendant Officer John Doe grabbed a packet, opened it, and gave it to Mr. Hehrer.

96.   After closing the door to Mr. Hehrer's cell, at approximately 2051 hours, Defendant Officer John Doe spoke to another Defendant Officer John Doe who was in the cage area.

97.   Throughout the night, Mr. Hehrer's condition declined rapidly.

98.   At approximately 2250 hours, Mr. Hehrer vomited again and stood up and lost his balance. Mr. Hehrer's cellmate attempted to get the attention of Defendant Officer John Doe, but nothing was done.

99.   At approximately 2352 hours, an inmate looked in on Mr. Hehrer and then had a conversation with Defendant Officer John Doe. The inmate appeared to be relaying his concern about Mr. Hehrer's health to Defendant Officer John Doe as the inmate looked back in on Mr. Hehrer.

### March 9, 2019

100.   At approximately 0129 hours, Mr. Hehrer threw up yet again. Defendant Officer John Doe walked past Mr. Hehrer's cell and into the Officer's cage without checking on him.

26

101.   Shortly thereafter, at approximately 0235 hours, Defendant Officer Jane Doe performed a cell check on Mr. Hehrer's cell. Defendant Officer Jane Doe stared at Mr. Hehrer for approximately 12 seconds, but simply walked away and went into the Officer's cage directly across from Mr. Hehrer's cell.

102.   At approximately 0446 hours, Defendant Officer John Doe completed a brief cell check.

103.   At approximately 0516 hours, Mr. Hehrer was noticeably slower and crawled to vomit again. He attempted to walk back to his bed with water while holding the door frame to steady himself.

104.   At approximately 0600 hours, or sometime thereafter, Defendant Officers Jane Does 1-2 and/or Defendant Officers John Does 1-5 indicated that Mr. Hehrer looked a lot more yellow than he did the day before.

105.   At approximately 0602 hours, Mr. Hehrer stood up and lost his balance as he braced his arm on the doorway and walked towards the toilet area.

106.   At approximately 0618 hours, Mr. Hehrer's cellmate got up to check on Mr. Hehrer and attempted to get the attention of Defendants Officers John Does. However, Defendant Officer John Doe, directly across from Mr. Hehrer's cell, was busy lounging in his chair and on his cell phone.

107. At approximately 0634 hours, two inmates arrived to serve breakfast near Mr. Hehrer's cell. They were forced to wait to serve it because Defendant Officer John Doe was still lounging in his chair on his cell phone.

108. Following breakfast, video surveillance illustrates a series of events which continue to demonstrate the deliberate indifference which Clinton County Defendants and ACH Defendants had toward Mr. Hehrer's serious medical needs:

   a. At approximately 0649 hours, Defendant Nurse Thelen first appeared for the day and spoke with Defendants Officers John Does 1-5 in the cage while going over paperwork.

   b. At approximately 0654 hours, Defendant Officer John Doe looked into Mr. Hehrer's cell and did nothing.

   c. At approximately 0655 hours, Defendant Officer John Doe appeared to be having a discussion with Nurse Thelen and Officer John Doe 2 in the cage about Mr. Hehrer, and yet they did nothing to assist him.

   d. Despite Mr. Hehrer being in medical observation, having thrown up throughout the last several days, having lost eighteen (18) pounds, having a yellow, jaundiced appearance, having blisters on his back, and having multiple inmates attempt to get the Defendants Officers and/or Nurses attention, Defendant Officer John Doe and Defendant Nurse Thelen appeared to have no sense of urgency regarding Mr. Hehrer's

deteriorating state and leisurely continued their morning, without any care or regard for Mr. Hehrer.

e.  At approximately 0656 hours, Defendant Officer John Doe and Defendant Nurse Thelen appeared to be discussing Mr. Hehrer's emergent state, but nothing was done.

f.  At approximately 0704 hours, Mr. Hehrer attempted to crawl towards the drain while Defendant Nurse Thelen was still in the cage.

g.  At approximately 0705 hours, Defendant Officer John Doe opened the door so the inmate could remove breakfast trays. It is apparent that the inmate was expressing concern about Mr. Hehrer's condition to Defendant Officer John Doe.

h.  At approximately 0706 hours, the inmate pointed to Mr. Hehrer, and then proceeded to enter the cell with a mop to clean vomit off the floor.

i.  Despite the inmates' obvious concern for Mr. Hehrer and the objective evidence that there was vomit on the floor, Defendant Nurse Thelen carelessly and negligently failed to check on Mr. Hehrer and continued to converse with Defendant Officers John Does 1-5.

j.  At approximately 0707 hours, Defendant Nurse Thelen, with complete indifference to Mr. Hehrer and his deteriorating medical condition, left the cage and walked away without checking on him.

Attorneys & Counselors at Law

VAHDAT WEISMAN
L A W

V|W

k. At approximately 0708 hours, with complete indifference to Mr. Hehrer and his deteriorating medical condition, Defendant Officer John Doe returned to lounge in his chair and was on his cell phone again.

l. At approximately 0723 hours until approximately 0746 hours, with complete indifference to Mr. Hehrer and his deteriorating medical condition, Defendants Officers John Does 1-5 located in the cage were again seen lounging in their chairs and on their cell phones.

m. At approximately 0731 hours, with complete indifference to Mr. Hehrer and his deteriorating medical condition, Nurse Thelen returned to the cage and left again, without checking on him.

n. At approximately 0755 hours, with complete indifference to Mr. Hehrer and his deteriorating medical condition, Defendant Officer John Doe walked by Mr. Hehrer's cell and looked in and failed to do anything.

o. At approximately 0835 hours, with complete indifference to Mr. Hehrer and his deteriorating medical condition, Defendant Officer John Doe walked by Mr. Hehrer's cell without looking in and checking on him.

p. At approximately 0840 hours, with complete indifference to Mr. Hehrer and his deteriorating medical condition, Mr. Hehrer held his head down between his legs. Defendants Officers Jane Doe and John Doe were

laughing with Defendant Nurse Thelen despite Mr. Hehrer's deteriorating condition.

q.   At 0841 hours, with complete indifference to Mr. Hehrer and his deteriorating medical condition, Defendant Officer John Doe walked by, yet again, and looked in Mr. Hehrer's cell and did nothing.

r.   At 0843 hours, Defendant Officer John Doe was in the Officer's cage by himself. However, he remained lounging with his feet up and on his phone with complete indifference to Mr. Hehrer and his deteriorating medical condition.

s.   At approximately 0851 hours, with complete indifference to Mr. Hehrer and his deteriorating medical condition, Defendant Nurse Thelen and Defendant Officer Jane Doe finished what appeared to be a funny conversation. Defendant Nurse Thelen then decided to enter Mr. Hehrer's cell despite having arrived two hours prior.

t.   At approximately 0855 hours, Defendant Officer John Doe went into Mr. Hehrer's cell while Defendant Officer Jane Doe stood outside the cell.

u.   At approximately 0858 hours, Defendant Nurse Thelen told Defendant Officer Jane Doe something funny, as Defendant Officer Jane Doe was

seen laughing outside of Mr. Hehrer's cell, showing substantial disregard for Mr. Hehrer's rapidly declining health.

v.  After initially evaluating Mr. Hehrer, Defendant Nurse Thelen simply went to retrieve a scale to obtain Mr. Hehrer's daily weight even though it was so obvious that even a lay person would comprehend that he needed emergency medical care. While trying to obtain his weight, Mr. Hehrer could not muster the strength to get up as he was in such an obvious debilitating state.

w.  Defendant Nurse Thelen and Defendants Officers John Does left Mr. Hehrer's cell.

x.  At approximately 0900 hours, Defendant Nurse Thelen observed Mr. Hehrer puking into the drain.

y.  A Critical Incident Report dated March 9, 2019 was completed by Defendant Sergeant J. Burdick who noted the following:

> On this date and time, the jail nurse was tying [*sic*] to check inmate Mr. Hehrer's vitals because of his condition. The nurse informed me that he needs to be transported to the hospital ASAP.

> Called Central Dispatch to have Clinton area sent to the jail. Clinton area arrived at approx. 09:10, departed the jail at 09:19 in route to Sparrow Main.

> Called Magistrate Dan Skorich and got a PR bond for inmate Mr. Hehrer. Capt. Wirth was called and informed of inmate Mr. Hehrer situation.

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

32

z.  At 0900 hours on March 9, 2019, Dawn Thelen, L.P.N. handwrote the following Narrative Progress Note:

> Pt vomited up Zofran and Prilosec. Coffee ground emesis. Pt unable to hold cup or meds on his own. Pt unable to stand. Pt skin cool to touch and pale yellow. Pt stated that he couldn't remember the last time he urinated or had a bowel movement or ate food/drank fluids. Sergeant notified and called 911. Lab specimens sent [with] pt. Dr. Parker notified.

aa. Shortly thereafter, Defendant Officer Jane Doe pointed into Mr. Hehrer's cell and said something to Defendant Nurse Thelen.

bb. Defendant Officer John Doe and Defendant Nurse Thelen then went to look into Mr. Hehrer's cell.

cc. Defendant Officer Jane Doe observed Mr. Hehrer again and walked away.

dd. At approximately 0903 hours, Defendant Nurse Thelen looked in again at Mr. Hehrer and appeared to be shaking her head side to side.

109.  Defendant Officer Becker then proceeded to call 911.

a.  When 911 asked Defendant Officer Becker what was going on, he responded "uh, um, um, what's going on with him, [Defendant Nurse Thelen]?"

b.  Defendant Officer Becker began to explain that Mr. Hehrer was "not taking up fluids, [and] puking up black stuff."

33

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

c.   Defendant Nurse Thelen elaborated to Central Dispatch that Mr. Hehrer had "dark brown vomit, jaundice, not eating, not urinating, no bowel movements, can't get up, [Mr. Hehrer could] hardly swallow, choke" and she further stated that Mr. Hehrer was "really in trouble" "and he's thrown up a lot."

d.   Defendant Officer Becker indicated that they were going to need a road deputy.

e.   When Central Dispatch asked Defendant Officer Becker what Mr. Hehrer's age was, Defendant Officer Becker took approximately thirty seconds to look up the date of birth for an individual that was an inmate since approximately January and who had allegedly been under medical observation for multiple days. When it became apparent that Defendant Officer Becker was unable to provide Mr. Hehrer's age, dispatch stated she only needed an approximate age. However, Defendant Officer Becker responded, "I don't even know how old [Mr. Hehrer] is."

f.   Defendant Nurse Thelen then stated, "I'm going to guess he's in his early twenties"

g.  While Defendant Officer John Doe indicated that Mr. Hehrer received a PR bond, Defendant Officer Becker told Dispatch that they no longer needed road patrol.

h.  As further evidence of Clinton County Defendants' callous disregard to Mr. Hehrer and his condition, Defendant Officer Becker laughed at the situation when Central Dispatch asked if Mr. Hehrer was completely alert by responding, "no, hehehe, no."

i.  Video surveillance shows that Mr. Hehrer was lying motionless.

j.  When Central Dispatch asked if Mr. Hehrer was breathing normally, Defendant Officer Becker responded, "eh light breathing I guess."

k.  When Central Dispatch asked if the bleeding was serious, Defendant Officer Becker initially stated "eeeee, no." However, Defendant Nurse Thelen spoke over him and stated, "yeah, it's coming out of his nose and mouth."

l.  When Central Dispatch asked if Mr. Hehrer had a bleeding disorder or was on blood thinners, Defendant Officer Becker stated, "I don't know if it's blood, it's just black stuff."

35

110.   At approximately 0907 hours, Mr. Hehrer's cellmate was pulled out of the cell and was transferred to a different cell. Defendant Officer John Doe brought Mr. Hehrer's belongings near his cell.

111.   At approximately 0912 hours, Clinton Area Ambulance Service Authority arrived at Clinton County Jail with a stretcher to initiate emergency treatment for Mr. Hehrer.

112.   At approximately 0915 hours, Defendant Nurse Thelen brought Mr. Hehrer's blood vials that were almost 24 hours old to EMS personnel.

113.   As Mr. Hehrer was transferred to the stretcher, he moved his left hand briefly and slightly and then went completely motionless until he left Clinton County Jail.

114.   EMS found Mr. Hehrer lying in his cell in the right lateral recumbent position with jaundice, profound weakness, and a coffee ground emesis stained face.

115.   EMS's initial assessment indicated that Mr. Hehrer was confused, that his skin was cold, jaundiced, and pale, that his pupils were reactive but sluggish, that his arms and legs were weak, and that he was only semi-conscious which complicated their assessment.

116.   Mr. Hehrer's initial blood pressure reading was 60/30 and his glucose read as "high".  During his transport to the hospital, his blood pressure dropped as low as 51/29.

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

117.  EMS's clinical impression was that Mr. Hehrer was experiencing cardiogenic shock, hypotension, hyperglycemia, weakness, and hypovolemic shock. Mr. Hehrer further had an altered mental state and physical impairment.

118.  Mr. Hehrer's transport was expedited due to his condition and EMS responded with immediate urgency.

119.  Advanced life support care was performed on Mr. Hehrer and he was transported with priority due to hyperglycemia and hypotension that was not resolved with fluid bolus.

120.  Instead of helping to save Mr. Hehrer's life by accurately informing EMS of Joseph's longstanding symptoms, Clinton County Defendants and/or ACH Defendants, in utter disregard for Mr. Hehrer's life and to likely minimize their own responsibility for his condition, told EMS that he's only thrown up blood and developed AMS symptoms that day.

121.  Mr. Hehrer arrived at Sparrow Hospital at approximately 0937 hours where he was hypotensive and hypothermic. Mr. Hehrer told the medical professionals at Sparrow Hospital that he had been puking up blood for the past 48 hours.

122.  At 1011 hours, a bair hugger was applied to Mr. Hehrer to assist him with his hypothermic state.

123.   A comprehensive diagnostic panel was performed on Mr. Hehrer. Mr. Hehrer's glucose measured at one thousand one hundred seventeen (1,117) and his body temperature measured at 93.6 degrees Fahrenheit.

124.   At 1022 hours, medical records indicate "Sergeant called from jail and stated he through [sic] up a ton of blood and has been losing a lot of weight… patient is discharged from jail to us."

125.   At 1404 hours, Dr. Rajit Pahwa, M.D. noted that "[Mr. Hehrer] has a high probability of sudden, clinically, significant deterioration, which requires the highest level of physician preparedness to intervene urgently".

126.   Mr. Hehrer was ultimately diagnosed with diabetic ketoacidosis and septic shock and was admitted to the critical care unit at Sparrow where he spent the remaining four (4) days of his life painfully suffering from complications including multiple strokes, gastrointestinal bleeding with hypotension, acute kidney injury and right jugular vein thrombosis.

127.   Mr. Hehrer died on March 13, 2019 at 1551 hours at the young age of 26-years-old.

128.   A March 14, 2019 autopsy conducted by Dr. Patrick Hansma, D.O., indicated that there was no evidence of intoxication or poisoning and concluded Mr. Hehrer's cause of death was the result of "multisystem organ dysfunction due to diabetic ketoacidosis."

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

## GENERAL ALLEGATIONS

129.   While Mr. Hehrer was incarcerated, Clinton County Defendants and ACH Defendants had subjective, objective, and/or actual knowledge of Mr. Hehrer's deteriorating health condition and continuously showed substantial disregard to his condition in that:

a.  Prior to entering medical observation, Mr. Hehrer was so weak, he urinated on himself because he could not get up to use the restroom and other inmates had to help Mr. Hehrer change his clothing.

b.  Defendants Officers Jane Does 1-2 and/or Defendants John Does 1-5 asked Mr. Hehrer how he was feeling to which he responded that he did not feel good.

c.  Despite Defendants Officers Jane Does' 1-2 and/or Defendants Officers John Does' 1-5 ability to monitor Mr. Hehrer and see that he did not ingest any substances, upon information and belief,   Defendants Officers Jane Does 1-2 and/or Defendants John Does 1-5 were ignoring Mr. Hehrer's deteriorating health condition because they believed "he [was] just withdrawing," despite no objective and/or subjective evidence suggesting withdrawal.

d.  Mr. Hehrer indicated to other inmates that he felt deathly sick.

39

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

e.  During Mr. Hehrer's decline at Clinton County Jail, he presented as hunched over, taking deep slow breaths, extremely pale and had black circles around his eyes.

f.  Upon information and belief, Defendant Officers Jane Does 1-2 and/or Defendants John Does 1-5 called Mr. Hehrer a "cry baby" and stated, "well he was hiding puking from us for a while, so he can't be that bad," despite Mr. Hehrer's objectively serious declining condition.

g.  Despite multiple inmates alerting Defendants Officers Jane Does 1-2 and/or Defendants Officers John Does 1-5 as to Mr. Hehrer's concerning condition, Defendants Officers Jane Does 1-2 and/or Defendants Officers John Does 1-5 said that there was nothing they could do.

h.  Defendants Officers Jane Does 1-2 and/or Defendants Officers John Does 1-5 observed Mr. Hehrer lying in or near his bloody vomit. When an inmate asked Defendant Officer Becker if he could clean Mr. Hehrer's cell, Defendant Officer Becker said, "let him lay in it."

i.  When Defendant Nurse Thelen and/or Defendant Nurse Freed would walk by Mr. Hehrer's cell, she only advised him to drink water and rest. Further, upon information and belief, despite very limited documentation, Mr. Hehrer told Defendant Nurse Thelen and/or

40

Defendant Nurse Freed every time she walked by that he was feeling severely ill and requested a blood test.

j.  Mr. Hehrer was observed lying next to a "dark red color" vomit. When inmates would pound on the door to check on Mr. Hehrer, he could only muster up the strength to open and close his eyes.

k.  After an inmate attempted to get Mr. Hehrer's attention, Defendant Officer Jane Doe 1-2 and/or Defendant Officer John Doe 1-5 stated that if Mr. Hehrer was so sick, that he should not be conversating, clearly showing that the Clinton County Defendants knew Mr. Hehrer was sick.

l.  Upon information and belief, Defendants Officers Jane Does 1-2 and/or Defendants John Does 1-5 were heard saying "[Mr. Hehrer] was released just in time to die," which further corroborates that Clinton County Defendants and/or ACH Defendants adopted a policy of careless disregard towards inmates, including Mr. Hehrer, and effectively dehumanized them and/or recklessly disregarded their health.

m.  Upon information and belief, Defendants Officers Jane Does 1-2 and/or Defendants Officers John Does 1-5 administered medications to

inmates without logging it against Clinton County Jail and/or ACH policies and/or procedures.

n. Upon information and belief, Defendants Officers Jane Does 1-2 and/or Defendants Officers John Does 1-5 asked inmates to administer medications to other inmates against Clinton County Jail and/or ACH policies and/or procedures.

o. Upon information and belief, medications were being passed around the Clinton County Jail as Defendants Officers Jane Does 1-2 and/or Defendants Officers John Does 1-5 would not verify that inmates had affirmatively swallowed their medication.

p. Clinton County Defendants and/or ACH Defendants repeatedly made it apparent that they avoided rendering medical care whenever possible as "getting help in there is not an easy thing."

130. Mr. Hehrer was exhibiting signs of deteriorating health for approximately two weeks prior to being moved for medical observation. Defendants Officers Jane Does 1-2 and/or Defendants Officers John Does 1-5 had subjective, objective, and/or actual knowledge of Mr. Hehrer's condition as Mr. Hehrer made multiple requests for medical attention and numerous inmates alerted the Defendant Officers as to Mr. Hehrer's worsening condition.

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

131.   Multiple inmates witnessed Defendants Officers Jane Does 1-2 and/or Defendants Officers John Does 1-5 acting deliberately indifferent towards Mr. Hehrer's medical needs despite him exhibiting medically objective signs of deterioration including but not limited to, looking pale, looking jaundiced, having watery eyes, exhibiting rosy ears and cheeks, having slurred speech, looking extremely fatigued, looking cold despite wearing long pants and sweating, and was unable to form full sentences.

132.   Mr. Hehrer and multiple inmates were deliberately ignored when they told Defendants Officers Jane Does 1-2 and/or Defendants John Does 1-5 that Mr. Hehrer had been vomiting blood for days and that Mr. Hehrer needed help and "looked like death."

133.   Clinton County Defendants and/or ACH Defendants showed a complete disregard to Mr. Hehrer and his medical condition; even other inmates showed more concern for Mr. Hehrer than the Clinton County Defendants and/or ACH Defendants. Further, evidence shows that the Clinton County Defendants and/or ACH Defendants adopted a policy of carelessness and dehumanization with its inmates.

134.   Despite Clinton County Jail having cameras to monitor inmates, Defendants Officers Jane Does 1-2 and/or Defendants Officers John Does 1-5 continuously and deliberately ignored the objective deterioration of Mr. Hehrer's

health as well as ignored multiple self-reports and other inmate reports of Mr. Hehrer's severe suffering.

135.   On March 8, 2019, despite Mr. Hehrer's temperature measuring at 96.7 degrees nearly reaching hypothermic levels, and having lost almost twenty pounds in one month, Clinton County Defendants and/or ACH Defendants failed to regularly and frequently check and monitor Mr. Hehrer while he was under medical observation.

136.   Upon information and belief, between March 7, 2019 and March 9, 2019, despite Mr. Hehrer's deteriorating condition, he was not physically evaluated by any Defendant ACH doctor.

137.   Further, despite Mr. Hehrer losing six (6) pounds between March 6, 2019 and March 8, 2019, Defendant Nurse Freed and Defendant Nurse Thelen acted in careless disregard towards Mr. Hehrer's medical condition and were more interested in conversing with jail staff than rendering medical care.

138.   Defendant Sergeant Bashore encouraged and/or directly participated in having inmates' kites disposed of by instructing other inmates to throw them away, potentially prolonging necessary medical attention and creating a custom and/or policy of violating inmates' constitutional rights.

139.   Further, upon information and belief, Clinton County Defendants and/or ACH Defendants had actual and/or constructive knowledge of a pattern of

similar constitutional violations as it is approximated that multiple inmates requested medical attention without being seen, including Mr. Hehrer.

140.   Upon information and belief, Mr. Hehrer made multiple requests for medical attention despite only two requests shown in the Clinton County Jail records, showing that Clinton County Defendants and/or ACH Defendants exhibited a deliberate indifference to inmate health and/or safety by having a custom and/or policy of dehumanizing inmates, preventing them from receiving appropriate medical care, and not reporting medical information properly.

141.   Once Clinton County Defendants realized Mr. Hehrer was in extreme medical distress, they acted in their own self-interest by rushing to secure a PR bond from Clinton County District Court for his release, attempting to relinquish their responsibility and their liability of Mr. Hehrer. Upon information and belief, it appears that the only time Clinton County Defendants and/or ACH Defendants rushed was to absolve themselves of liability.

142.   Upon information and belief, Defendant Sergeant Burdick, Defendant Officer Becker, Defendant Officer Jane Does 1-2, Defendant Officer John Does 1-5, and Defendant Nurse Thelen deliberately prolonged the decision to contact emergency medical services in order to first contact the Court despite Mr. Hehrer's life-threatening state that was so obvious even a lay person would have easily recognized the necessity for immediate emergency medical attention.

45

143. Unsurprisingly, Clinton County Defendants realized they forgot to secure a PR bond for Mr. Hehrer from Clinton County Circuit Court, and Mr. Hehrer was transferred alone to the hospital unescorted and/or unguarded.

144. Clinton County Defendants elected not to contact Mr. Hehrer's parents regarding his life-threatening state and inform them that he was rushed to the hospital.

145. Mr. Hehrer remained under the care and custody of Clinton County Defendants until approximately 1722 hours.

146. Pursuant to Clinton County Defendant's policies and procedures, Clinton County Defendants failed to escort and/or guard Mr. Hehrer to the hospital while he remained in their care and custody.

147. Mr. Hehrer remained alone until his parents were finally notified at approximately 1815 hours by someone other than Clinton County Defendants.

148. Upon information and belief, Clinton County Defendants made the deliberate and intentional decision to wait until they could contact the court to accelerate Mr. Hehrer's release, rather than transfer him immediately to an off-site acute care facility and/or hospital, so that Defendant Clinton County would not incur the additional expense of transporting and/or guarding an inmate transferred to the hospital.

149.   That Clinton County Defendants' and/or ACH Defendants' calculated decision to forego emergency medical attention for Mr. Hehrer, namely, the immediate transfer to an acute care facility and/or emergency department, where they had subjective and objective knowledge of Mr. Hehrer's condition, in order to save money and manpower, amounted to cruel, unusual, and inhumane suffering, and deliberate indifference to Mr. Hehrer's serious medical needs.

150.   Even though Mr. Hehrer was under the care and custody of Clinton County Defendants since January 23, 2019, Clinton County Defendants still could not state what his birthday was, did not know what his bond conditions and/or status were, and were unable to give an approximate age when Mr. Hehrer needed to go to the hospital.

151.   Clinton County Defendants and ACH Defendants had subjective, objective, and actual knowledge of Mr. Hehrer's serious medical conditions, based upon their observations of him, his communications of the same, and the inmates' communications of the same.

152.   Upon information and belief, pursuant to Clinton County Jail and ACH policies and procedures, Mr. Hehrer was to be regularly and frequently checked and monitored by Clinton County Defendants and/or ACH Defendants while incarcerated and under medical observation.

47

153. While suffering from symptoms of hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock, Mr. Hehrer and other inmates notified Clinton County Defendants and/or ACH Defendants on several occasions of his declining condition. Clinton County Defendants and ACH Defendants observed Mr. Hehrer suffering from serious and objectively identifiable medical conditions.

154. Upon information and belief, Clinton County Defendants and/or ACH Defendants had subjective, objective, and/or actual knowledge of Mr. Hehrer's serious medical condition, i.e. hyperglycemia, hypothermia, diabetic ketoacidosis and/or septic shock, based upon their observations of him, his requests for medical attention, his medical records, and inmates' communications of same.

155. Clinton County Defendants and/or ACH Defendants further had objective, subjective, and/or actual knowledge of Mr. Hehrer's symptoms, i.e. vomiting, low body temperature, pain, serious and ongoing suffering, based upon their knowledge, training and experience.

156. Upon information and belief, despite Mr. Hehrer's obvious ongoing symptoms, at no point in time was a no-cost, on site test for blood glucose levels performed by ACH Defendants and/or Clinton County Defendants.

157. Despite Clinton County Defendants' and/or ACH Defendants' subjective, objective, and/or actual knowledge of Mr. Hehrer's serious medical needs, Defendants made the conscious decision to deliberately ignore Mr. Hehrer's

signs and symptoms of an objectively serious medical condition, left him to suffer in medical "observation," prolonged obtaining the appropriate medical treatment, and failed to administer any tests which would alert them to his condition or save him from the needless suffering he endured, which amounts to cruel and unusual punishment and a violation of his Constitutional Rights.

158.   Clinton County Defendants and/or ACH Defendants were deliberately indifferent to Mr. Hehrer's plainly visible serious medical needs where they subjectively, objectively, and/or actually knew that Mr. Hehrer was in obvious distress and in serious need of life-saving medical assistance.

159.   On several occasions, Mr. Hehrer, while suffering from symptoms of hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock, notified Defendants Officers Jane Does 1-2, Defendants Officers John Does 1-5 and Defendant Nurse Freed and Defendant Nurse Thelen of the same, and was observed by Defendants as suffering from the serious and objectively-identifiable medical condition.

160.   Clinton County Defendants and/or ACH Defendants observed Mr. Hehrer vomiting, crawling, falling down, his unresponsiveness, and his rapidly deteriorating health state.

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

161.  Upon information and belief, Clinton County Defendants also had video monitors from which they observed Mr. Hehrer's objective signs of obvious deteriorating health.

162.  Clinton County Defendants and/or ACH Defendants had subjective, objective, and/or actual knowledge, that Mr. Hehrer was vomiting profusely and was suffering from other symptoms related to hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock.

163.  Despite Clinton County Defendants' and/or ACH Defendants' subjective, objective, and/or actual knowledge of Mr. Hehrer's serious medical needs, having time to consider the consequences of their actions, and as days and hours passed while Mr. Hehrer continued to deteriorate and needlessly suffer, Defendants deliberately ignored and were indifferent to Mr. Hehrer's emergent signs and symptoms of hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock.

164.  Mr. Hehrer's declining health was plainly visible to all who accessed Mr. Hehrer's records and/or observed him, including Clinton County Defendants and/or ACH Defendants.

165.  Based upon Clinton County Defendants' and ACH Defendants' observations and knowledge of Mr. Hehrer's condition, his communications of his pain and suffering, and inmates' communications of the same, Defendants

repeatedly made the intentional and measured decision to "monitor" rather than seek medical attention for Mr. Hehrer, including calling for emergency transport to an acute care facility and/or hospital while he continued to needlessly suffer and deteriorate.

166.   Despite having subjective, objective, and/or actual knowledge of Mr. Hehrer's serious medical needs, Clinton County Defendants and/or ACH Defendants were deliberately indifferent to his serious medical needs and made the conscious decision to leave Mr. Hehrer in the Clinton County Jail where he continued to needlessly suffer, disregarding the consequences of their actions, thereby violating Mr. Hehrer's Constitutional right to be free from cruel and unusual punishment.

167.   Despite Clinton County Jail and ACH policies and procedures, Clinton County Defendants and/or ACH Defendants tolerated policies exhibiting a complete disregard amounting to deliberate indifference of inmates' health and/or sanitary and/or safety needs as illustrated by the facts as fully set forth above as well as the following:

> a.   Upon information and belief, prior to Mr. Hehrer's incarceration, another inmate had overdosed on fentanyl while in the care and custody of Clinton County Defendants;

51

b.  Upon information and belief, despite multiple requests for help from Clinton County Defendants and/or ACH Defendants, an inmate with MRSA did not receive medical attention until the infection on his face developed pus.

c.  Upon information and belief, another inmate with a genital infection was not seen until the area had become swollen and exhibited signs of pus;

d.  Upon information and belief, inmates, including Mr. Hehrer, were refused the contracted for medical attention and care that ACH Defendants and Clinton County Defendants were obligated to provide until inmates' medical conditions became so severe that Defendants were forced to send them to the hospital;

e.  Upon information and belief, inmates were often not given toilet paper and told to "fight for it." If they were not given toilet paper or could not acquire it, they were left to have a bowel movement and then take a shower to clean themselves;

f.  Upon information and belief, inmates were often not given mattresses upon arrival at Clinton County Jail and were also told to "fight for it;"

g.  Upon information and belief, upon arrival at Clinton County Jail, some inmates did not receive any medical screening;

52

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

h. Upon information and belief, when inmates were detoxing at Clinton County Jail, they would not receive medical attention for days despite requesting assistance;

i. Upon information and belief, inmates were administering medications to other inmates, including but not limited to, insulin, administering blood sugar tests, and administering other medications;

j. Upon information and belief, Defendant Dr. Parker would sign off on inmate medical records without review;

k. While incarcerated at Clinton County Jail, a diabetic inmate had low blood sugar, communicated this with Clinton County Defendants and was ignored. Finally, the inmate received glucose tablets, however, Clinton County Defendants and/or ACH Defendants would not give her the correct dose, causing her blood sugar fall to alarming levels by the time she was released; and,

l. Against the policies and procedures of Clinton County Jail, video surveillance shows Clinton County Defendants dragging an inmate into a cell and covering up all the windows with a Velcro padding so that it was impossible to see and/or observe the inmate inside of the cell.

## COUNT I – MEDICAL MALPRACTICE – DR. KIMBERLEE CHESNEY AND EDWARD W. SPARROW HOSPITAL

168.  Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one (1) through one hundred sixty-seven (167) as if fully set forth herein.

169.  The standard of care applicable to Defendant Dr. Kimberlee Chesney, individually and as an agent, servant, and/or employee of Defendant Edward W. Sparrow Hospital, required Defendant Dr. Chesney to maintain the standard of care of her peers within the professional community of emergency medicine. The requirements of the standard of care, included, but were not limited to, the following:

   a. During Mr. Hehrer's January 18, 2019 presentation at Defendant Edward Sparrow Hospital, identify any signs and/or symptoms of hyperglycemia and timely and appropriately order follow-up care to appropriately treat, manage and/or monitor this condition;

   b. During Mr. Hehrer's January 18, 2019 presentation at Defendant Edward Sparrow Hospital, inform Mr. Hehrer of any and all abnormalities identified in diagnostic and/or laboratory studies, including any signs and/or symptoms of hyperglycemia and explain to Mr. Hehrer the significance of any such abnormalities; and

   c. During Mr. Hehrer's January 18, 2019 presentation at Defendant Edward Sparrow Hospital, adhere to any and all additional requirements of the standard of care as may be revealed through the discovery process.

54

170. Defendant Dr. Kimberly Chesney, individually and as an agent, servant, and/or employee of Defendant Edward W. Sparrow Hospital. Defendant Dr. Chesney breached the applicable standard of care[2] by failing to:

    a. During Mr. Hehrer's January 18, 2019 presentation at Defendant Edward Sparrow Hospital, identify any signs and/or symptoms of hyperglycemia and timely and appropriately order follow-up care to appropriately treat, manage and /or monitor this condition;

    b. During Mr. Hehrer's January 18, 2019 presentation at Defendant Edward Sparrow Hospital, inform Mr. Hehrer of any and all abnormalities identified in diagnostic and/or laboratory studies and explain to Mr. Hehrer the significance of any such abnormalities; and

    c. During Mr. Hehrer's January 18, 2019 presentation at Defendant Edward Sparrow Hospital, adhere to any and all additional requirement of the standard of care as may be revealed through the discovery process.

171. As a direct and proximate result of the negligence and professional negligence of Defendant Dr. Kimberlee Chesney, Plaintiff is entitled to recover all damages allowable under the Michigan Wrongful Death Act, including but not limited to:

    a. Reasonable medical, hospital, funeral and burial expenses;

    b. Reasonable compensation for the pain and suffering undergone by Mr. Hehrer while he was conscious during the time between his injuries and his death;

    c. Loss of financial support;

---

[2] Exhibit 2: Affidavit of Meritorious Claim by Robert Mulliken, M.D.

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

   d.  Loss of service;

   e.  Loss of gifts or other valuable gratuities;

   f.  Loss of society and companionship; and

   g.  Any and all other damages as identified through the course of discovery as otherwise available under the Michigan Wrongful Death Act, MCL 600.2922.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) exclusive of costs, interest and attorney fees.

## COUNT II – MEDICAL MALPRACTICE – DR. DARYL TYRONE PARKER, CLINTON COUNTY JAIL AND ADVANCED CORRECTIONAL HEALTHCARE

172.  Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one (1) through one hundred seventy-one (171) as if fully set forth herein.

173.  The standard of care applicable to Defendant Daryl Tyrone Parker, individually and as an agent, servant, and/or employee of Defendant Advanced Correctional Healthcare, Inc., and the Clinton County Jail, required Defendant Dr. Parker to maintain the standard of care of his peers within the professional community of internal medicine. The requirements of the standard of care, included, but were not limited to, the following:

a.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker was required to monitor Mr. Hehrer's vital signs at all times and treat him for any signs and symptoms of diabetic ketoacidosis and septic shock;

b.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker was required to order appropriate and timely lab studies for Mr. Hehrer's in order to properly diagnose and treat Mr. Hehrer's diabetic ketoacidosis and septic shock;

c.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker was required to fully appreciate any signs and symptoms of diabetic ketoacidosis and septic shock and timely and appropriately transfer him to an appropriate medical facility capable of appropriately treating him;

d.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker was required to personally review all nursing reports and/or other pertinent reports pertaining to Mr. Hehrer, the patient for whose medical care and treatment Defendant Dr. Parker was responsible, in order to properly treat him for any impending diabetic ketoacidosis and septic shock;

e.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker was required to personally travel to the Clinton County Jail and personally evaluate Mr. Hehrer for signs and symptoms of diabetic ketoacidosis and septic shock;

f.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker was required to personally follow up on all lab and other testing and convey any and all results to any transferring medical institution;

g.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker was required to consult with or refer Mr. Hehrer to the appropriate medical specialist, such as an infectious disease physician and/or

57

endocrinologist to evaluate and properly treat him for any impending diabetic ketoacidosis and septic shock;

h. During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker was required to exercise skill and caution when involved in the care of Mr. Hehrer by timely making a diagnosis of septic shock and timely documenting the same;

i. During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker was required to exercise skill and caution when involved in the care of Mr. Hehrer by timely making a diagnosis of diabetic ketoacidosis and timely documenting the same; and,

j. Defendant Dr. Parker was required to adhere to any and all additional requirement of the standard of care as may be revealed through the discovery process.

174. Defendant Dr. Daryl Tyrone Parker individually and as an agent, servant, and/or employee of Defendant Advanced Correctional Healthcare, Inc., and the Clinton County Jail, Defendant Dr. Parker breached the applicable standard of care[3] in the manner set forth below:

a. During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker failed to monitor Mr. Hehrer's vital signs at all times and treat him for any signs and symptoms of diabetic ketoacidosis and septic shock;

b. During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker failed to order appropriate lab studies for Mr. Hehrer's in order to properly diagnose and treat Mr. Hehrer's diabetic ketoacidosis and septic shock;

---

[3] Exhibit 3: Affidavit of Meritorious Claim by Dr. Neil Farber, M.D.

58

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

c.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker failed to fully appreciate any signs and symptoms of diabetic ketoacidosis and septic shock and timely and appropriately transfer him to an appropriate medical facility capable of appropriately treating him;

d.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Dr. Parker failed to personally review all nursing reports and/or other pertinent reports pertaining to Mr. Hehrer, the patient for whose medical care and treatment Dr. Parker was responsible, in order to properly treat him for any impending diabetic ketoacidosis and septic shock;

e.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker failed to personally travel to the Clinton County Jail and personally evaluate Mr. Hehrer for signs and symptoms of diabetic ketoacidosis and septic shock;

f.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker failed to personally follow up on all lab and other testing and convey any and all results to any transferring medical institution;

g.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker failed to consult with or refer Mr. Hehrer to the appropriate medical specialist, such as an infectious disease physician and/or endocrinologist to evaluate and properly treat him for any impending diabetic ketoacidosis and septic shock;

h.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker failed to exercise skill and caution when involved in the care of Mr. Hehrer by timely making a diagnosis of septic shock and timely documenting same;

i.  During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Parker failed to exercise skill and caution when involved in the care of Mr. Hehrer by

timely making a diagnosis of diabetic ketoacidosis and timely documenting the same; and

j. Defendant Dr. Parker failed to adhere to any and all additional requirements of the standard of care as may be revealed through the discovery process.

175. As a direct and proximate result of the negligence and professional negligence of Defendant Dr. Daryl Tyrone Parker, Plaintiff is entitled to recover all damages allowable under the Michigan Wrongful Death Act, including but not limited to:

a. Reasonable medical, hospital, funeral and burial expenses;

b. Reasonable compensation for the pain and suffering undergone by Mr. Hehrer while he was conscious during the time between his injuries and his death;

c. Loss of financial support;

d. Loss of service;

e. Loss of gifts or other valuable gratuities;

f. Loss of society and companionship; and

g. Any and all other damages as identified through the course of discovery as otherwise available under the Michigan Wrongful Death Act, MCL 600.2922.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) exclusive of costs, interest and attorney fees.

## COUNT III – MEDICAL MALPRACTICE – DR. JOSEPH MASHNI

176. Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one (1) through one hundred seventy-five (175) as if full set forth herein.

177. The standard of care applicable to Defendant Dr. Joseph W. Mashni, individually and as an agent, servant, and/or employee of Defendant Advanced Correctional Healthcare, Inc., and the Clinton County Jail, required Defendant Dr. Mashni to maintain the standard of care of his peers within the professional communities of internal medicine and/or urology. The requirements of the standard of care, included, but were not limited to, the following:

     a. During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Mashni was required to order appropriate and timely lab studies for Mr. Hehrer's in order to properly diagnose and treat Mr. Hehrer's diabetic ketoacidosis and septic shock;

     b. During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Mashni was required to personally travel to the Clinton County Jail and personally evaluate Mr. Hehrer;

     c. During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Mashni was required to personally follow up on all lab and other testing and convey any and all results to any transferring medical institution;

     d. During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Mashni was required to consult with or refer Mr. Hehrer to the appropriate medical specialist or emergency department to evaluate and properly treat him

for his underlying hyperglycemia and any impending diabetic ketoacidosis and septic shock;

    e.    Defendant Dr. Mashni was required to adhere to any and all additional requirements of the standard of care as may be revealed through the discovery process.

178.    Defendant Dr. Joseph W. Mashni, individually and as an agent, servant, and/or employee of Defendant Advanced Correctional Healthcare, Inc., and the Clinton County Jail, Defendant Dr. Mashni breached the applicable standard of care[4] in the manner set forth below:

    a.    During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Mashni failed to order appropriate lab studies for Mr. Hehrer;

    b.    During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Mashni failed to personally travel to the Clinton County Jail and personally evaluate Mr. Hehrer;

    c.    During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Mashni failed to personally follow up on all lab and other testing and convey any and all results to any transferring medical institution;

    d.    During Mr. Hehrer's incarceration at the Clinton County Jail on January 23, 2019 and continuously thereafter, Defendant Dr. Mashni failed to consult with or refer Mr. Hehrer to the appropriate medical specialist, or emergency department to evaluate and properly treat him for his underlying hyperglycemia any impending diabetic ketoacidosis and septic shock; and

---

[4] Exhibit 4: Affidavit of Meritorious Claim by Dr. Amy Brode, D.O.

e. Defendant Dr. Mashni failed to adhere to any and all additional requirements of the standard of care as may be revealed through the discovery process.

179.   As a direct and proximate result of the negligence and professional negligence of Defendant Dr. Joseph W. Mashni, Plaintiff is entitled to recover all damages allowable under the Michigan Wrongful Death Act, including but not limited to:

a. Reasonable medical, hospital, funeral and burial expenses;

b. Reasonable compensation for the pain and suffering undergone by Mr. Hehrer while he was conscious during the time between his injuries and his death;

c. Loss of financial support;

d. Loss of service;

e. Loss of gifts or other valuable gratuities;

f. Loss of society and companionship; and

g. Any and all other damages as identified through the course of discovery as otherwise available under the Michigan Wrongful Death Act, MCL 600.2922.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) exclusive of costs, interest and attorney fees.

## COUNT IV – MEDICAL MALPRACTICE – NURSING STAFF AT EDWARD W. SPARROW HOSPITAL, ADVANCED CORRECTIONAL HEALTHCARE AND CLINTON COUNTY JAIL

180.   Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one (1) through one hundred seventy-nine (179) as if fully set forth herein.

181.   The standard of care applicable to the nursing staff at Defendant Edward Sparrow Hospital, Defendant Advanced Correctional Healthcare and the Clinton County Jail, by and through their agents, assigns, representatives and employees, including but not limited to RNs, LPNs, RTs, nursing assistants, and CNA's is the skill and care ordinarily possessed and exercised by practitioners of their profession in the same or similar localities.  At a minimum, Defendant Edward Sparrow Hospital and Clinton County Jail through its agents, assigns, representatives and employees, including but not limited to RNs, LPNs, RTs nursing assistants and CNA's, had a duty to:

    a.  Provide Mr. Hehrer with reasonable care and/or such care as would a reasonably prudent hospital nursing or nursing related staff;

    b.  Skillfully evaluate, assess and treat the patient;

    c.  Implement an appropriate report all pertinent findings to the attending physicians and/or consulting physicians;

    d.  Identify any signs and/or symptoms of hyperglycemia and timely order follow-up care to appropriately treat, manage and /or monitor this condition;

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

e. Fully appreciate Mr. Hehrer's hyperglycemia and ensure that Mr. Hehrer is informed of this condition and provided appropriate instructions regarding follow up care for the same;

f. Fully appreciate any signs and symptoms of diabetic ketoacidosis and septic shock;

g. Monitor Mr. Hehrer's vital signs at all times and treat him for any signs and/or symptoms of diabetic ketoacidosis and septic shock;

h. Immediately and timely report any change in Mr. Hehrer's condition to the appropriate attending physicians and/or consulting physicians;

i. Timely ensure that all staff members are aware of, following and carrying out formulated interventions.

j. Timely provide a basis for determining and managing Mr. Hehrer's progress including response to treatment, change in condition and changes in treatment, through timely, complete, accurate and organized clinical information that is readily accessible for patient care.

k. Provide an adequate number of staff in order to ensure that appropriate assessments, care plans, monitoring, treatment, interventions, notifications and documentation are performed in a timely manner; and

l. Comply with such other standards of practice or care as are revealed through the course of discovery.

182. The standard of care applicable to the nursing staff at Defendant Edward Sparrow Hospital, Defendant Advanced Correctional Healthcare and the Clinton County Jail, by and through their agents, assigns, representatives and

employees, including but not limited to RNs, LPNs, RTs, nursing assistants, and CNA's breach the standard of care[5] in the manner set forth below:

    a.  Failed to provide Mr. Hehrer with reasonable care and/or such care as would a reasonably prudent hospital nursing or nursing related staff;

    b.  Failed to skillfully evaluate, assess and treat the patient;

    c.  Failed to implement an appropriate report all pertinent findings to the attending physicians and/or consulting physicians;

    d.  Failed to fully appreciate any signs and symptoms of diabetic ketoacidosis and septic shock;

    e.  Failed to monitor Mr. Hehrer's vital signs at all times and treat him for any signs and/or symptoms of diabetic ketoacidosis and septic shock;

    f.  Failed to immediately and timely report any change in Mr. Hehrer's condition to the appropriate attending physicians and/or consulting physicians;

    g.  Failed to timely ensure that all staff members are aware of, following and carrying out formulated interventions.

    h.  Failed to timely provide a basis for determining and managing Mr. Hehrer's progress including response to treatment, change in condition and changes in treatment, through timely, complete, accurate and organized clinical information that is readily accessible for patient care.

    i.  Failed to provide an adequate number of staff in order to ensure that appropriate assessments, care plans, monitoring, treatment, interventions, notifications and documentation are performed in a timely manner

    j.  Failed to comply with such other standards of practice or care as are revealed through the course of discovery.

---

[5] Exhibit 5: Affidavits of Meritorious Claim by Kimberly Steiner, L.P.N. and Maureen Banathy, R.N.

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

183.   As a direct and proximate result of the negligence and professional negligence of the nursing staff, Plaintiff is entitled to recover all damages allowable under the Michigan Wrongful Death Act, including but not limited to:

    a.   Reasonable medical, hospital, funeral and burial expenses;

    b.   Reasonable compensation for the pain and suffering undergone by Mr. Hehrer while he was conscious during the time between his injuries and his death;

    c.   Loss of financial support;

    d.   Loss of service;

    e.   Loss of gifts or other valuable gratuities;

    f.   Loss of society and companionship; and

    g.   Any and all other damages as identified through the course of discovery as otherwise available under the Michigan Wrongful Death Act, MCL 600.2922.

## COUNT V

## DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

## VIOLATION OF EIGHTH AMENDMENT PURSUANT TO 42 U.S.C. §1983 (SERGEANT SARAH FAGGIONS, SERGEANT JAMES BURDICK, SERGEANT CHAD BASHORE, SERGEANT RICHARD STOUT, OFFICER COREY BECKER, OFFICERS JANE DOES 1-2, OFFICERS JOHN DOES 1-5)

184.   Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one (1) through one hundred eighty-three (183) as if fully set forth herein.

Attorneys & Counselors at Law

VAHDAT WEISMAN LAW

V|W

185. Defendants Sergeant Sarah Faggions, Sergeant James Burdick, Sergeant Chad Bashore, Sergeant Richard Stout, Officer Corey Becker, Officers Jane Does 1-2, and Officers John Does 1-5 (hereinafter "Corrections Defendants") were acting under the color of state law and subjected Mr. Hehrer to a deprivation of his rights, privileges and immunities secured by the Constitution and laws of the United States and the State of Michigan.

186. Pursuant to 42 U.S.C. §1983, and the Eighth and Fourteenth Amendments to the United States Constitution, the Corrections Defendants owed Mr. Hehrer duties to act prudently and with reasonable care, and otherwise act without imposing cruel and unusual punishment.

187. That the acts or omissions by the Corrections Defendants, as more specifically described in the Factual Allegations and General Allegations Sections above, were unreasonable and performed knowingly, wantonly, deliberately, indifferently, intentionally, maliciously, willfully, and with gross negligence, callousness, consciousness, and deliberate indifference to Mr. Hehrer's well-being and serious medical needs.

188. That Mr. Hehrer's medical needs, namely, hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock, were objectively serious, as they were diagnosed by a medical professional and/or were so obvious that even a lay person would easily recognize the necessity for medical attention.

68

189.    That the Corrections Defendants had subjective, objective, and/or actual knowledge of the serious risk of harm to Mr. Hehrer and disregarded the risk by the acts and/or omissions as outlined in the Factual Allegations and General Allegations Sections above.

190.    That the conduct of the Corrections Defendants, individually, deprived Mr. Hehrer of his clearly established rights, privileges, and immunities guaranteed under the United States Constitution, specifically those set forth under the Eighth and Fourteenth Amendments, as evidenced by the following particulars offered by way of illustration, including but not limited to:

a.    Deliberately ignoring Mr. Hehrer's self-reports that he was exhibiting symptoms related to hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock;

b.    Deliberately ignoring Clinton County Jail and/or ACH records where his medical records appeared prominently and were accessible to all Clinton County Defendants;

c.    Deliberately ignoring the requests for help from multiple inmates as to Mr. Hehrer's rapidly declining health;

d.    Failing to ensure Mr. Hehrer was eating his meals;

e.    Failing to monitor Mr. Hehrer's water intake;

f.    Failing to observe and/or monitor Mr. Hehrer as requested and ordered;

69

g.  Failing to observe and/or monitor Mr. Hehrer as required by Clinton County Jail and/or ACH policies;

h.  Failing to observe and/or monitor Mr. Hehrer via continuous camera monitoring and/or frequent cell checks;

i.  Failure to timely make referrals to medical or nursing personnel where Mr. Hehrer was clearly displaying obvious and serious signs of hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock;

j.  Failing to contact medical and/or nursing personnel when Defendants knew that Mr. Hehrer was under medical observation related to his rapidly deteriorating health;

k.  Failing to request immediate medical attention despite subjective, objective and/or actual knowledge of Mr. Hehrer's deteriorating health condition;

l.  Failing to request emergency medical attention by calling "911" in an urgent manner when it was obvious that Mr. Hehrer's condition warranted his transfer to an acute care facility and/or hospital;

m. Failing to protect inmates' health by combining inmates in medical observation cells, inevitably forcing inmates to sleep on the floor be exposed to unknown diseases and health risks.

n. Failing to report to medical staff that Mr. Hehrer was not taking meals or fluids and/or that Mr. Hehrer was observed ingesting an excess amount of fluids;

o. Failing to monitor Mr. Hehrer when Defendants had subjective, objective, and/or actual knowledge of his deteriorating health;

p. Failing to request and arrange for timely medical attention when it was known Mr. Hehrer was vomiting and/or unresponsive;

q. Failing to intervene and to prevent the ongoing constitutional violations against Mr. Hehrer by Clinton County Defendants and/or ACH Defendants, where Corrections Defendants had numerous and reasonable opportunities to intervene,

r. Failing to properly document Mr. Hehrer's self-reports of symptoms related to hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock in the Clinton County Jail records;

s. Failure to abide by Clinton County Jail policies and procedures and/or ACH policies and procedures by administering medication and/or medical treatment to inmates without nurse and/or doctor approval and/or without logging it;

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

    t.  Failure to abide by Clinton County Jail policies and procedures and/or ACH policies and procedures by allowing inmates to administer medication and/or medical treatment to inmates;

    u.  Failure to maintain accurate and appropriate records of any and all events that transpired in the Clinton County Jail regarding Mr. Hehrer's health condition, and;

    v.  Any other wrongful acts and/or omissions that become known through the course of discovery.

191.   As a direct and proximate result of the wrongful conduct of each of the Corrections Defendants, Plaintiff has been substantially and irreparably injured. These injuries to Mr. Hehrer and his Estate include, but are not limited to:

    a.  Hyperglycemia;

    b.  Hypothermia;

    c.  Diabetic ketoacidosis;

    d.  Septic shock;

    e.  Mr. Hehrer's severe and inhumane emotional and mental pain and suffering;

    f.  Shock, fright, and humiliation;

    g.  Prolonged hospital stay due to complications from injury;

    h.  Conscious pain and suffering;

i. Loss of society and companionship of the heirs of the Estate;

j. Great pain, emotional and psychological distress of the heirs of the Estate;

k. Loss of support and earning capacity;

l. Medical expenses;

m. Funeral and burial expenses; and

n. Any additional damages that become known through discovery and available under Michigan and federal law pursuant to 42 U.S.C. §§ 1983 and 1988.

## <u>COUNT VI</u>

## <u>DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS</u>

## <u>VIOLATION OF EIGHTH AMENDMENT PURSUANT TO 42 USC §1983 (DARYL TYRONE PARKER, MD, JOSEPH W. MASHNI, MD, WENDY LYNN FREED, LPN, DAWN THELEN, LPN)</u>

192. Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one (1) through one hundred ninety-one (191) as if fully set forth herein.

193. That, at all times relevant, Defendants, Daryl Tyrone Parker, MD, Joseph W. Mashni, MD, Wendy Lynn Freed, LPN, and Dawn Thelen, LPN (hereinafter "Jail Medical Defendants") were employees of Defendant, ACH.

194. That upon information and belief, Defendant Dr. Parker, was the highest-ranking medical personnel on staff for Defendant ACH and Defendant Clinton County, during Mr. Hehrer's incarceration at Clinton County Jail.

195. That upon information and belief, between March 7, 2019 to March 9, 2019, Defendant Dr. Parker never physically evaluated Mr. Hehrer.

196. That upon information and belief, Defendant Dr. Mashni, was only contacted by telephone on one occasion regarding the treatment of Mr. Hehrer.

197. That the Jail Medical Defendants, as more specifically described above, were unreasonable and performed knowingly, wantonly, deliberately, indifferently, intentionally, maliciously, and with gross negligence, callousness, and deliberate indifference to Mr. Hehrer's serious medical needs.

198. That Mr. Hehrer's medical needs, namely, hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock, were objectively serious as they were diagnosed by a medical professional and/or were so obvious that even a lay person would easily recognize the necessity for medical attention.

199. That the Jail Medical Defendants had subjective, objective, and/or actual knowledge of the serious risk of harm to Mr. Hehrer and disregarded the risk by the acts and/or omissions as outlined in the Factual Allegations and General Allegations Sections above.

200.   That the conduct of the Jail Medical Defendants deprived Mr. Hehrer of his clearly established rights, privileges, and immunities guaranteed under the United States Constitution, specifically those set forth under the Eighth and Fourteenth Amendments to same, as evidenced by the following particulars offered by way of illustration including but not limited to:

a.   Deliberately ignoring Mr. Hehrer's self-reports that he was suffering from symptoms related to hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock;

b.   Deliberately ignoring Clinton County Jail and/or ACH records where Mr. Hehrer's Medical Records appeared prominently and were accessible to all Jail Medical Defendants;

c.   Deliberately ignoring the requests for help from multiple inmates as to Mr. Hehrer's rapidly declining health;

d.   Failing to ensure Mr. Hehrer was eating his meals;

e.   Failing to ensure Mr. Hehrer's water intake;

f.   Failing to observe and/or monitor Mr. Hehrer as requested and ordered;

g.   Failing to observe and/or monitor Mr. Hehrer as required by Clinton County Jail and/or ACH policies;

h.   Failing to observe and/or monitor Mr. Hehrer via continuous camera and/or personal monitoring;

i.   Failing to timely transfer Mr. Hehrer to medical observation;

j.   Failing to prioritize and/or triage Mr. Hehrer's obvious medical needs;

k.   Failing to order hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock medications timely;

l.   Failing to administer hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock medications in a timely manner and/or in proper dosages;

m.  Failing to properly and timely enter notations in medical charting;

n.   Failing to request immediate medical attention despite subjective, objective and/or actual knowledge of Mr. Hehrer's deteriorating health condition;

o.   Failing to request emergency medical attention by calling "911" in an urgent manner when it was obvious that Mr. Hehrer's condition warranted his transfer to a licensed acute care facility and/or hospital;

p.   Failing to report to Defendant Dr. Parker and/or Defendant Dr. Mashni that Mr. Hehrer was not taking meals or fluids;

q.   Failing to administer, perform, and/or order basic medical diagnostic testing associated with Mr. Hehrer's symptoms of hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock;

76

r.  Failing to monitor Mr. Hehrer who was known to be suffering from symptoms related to hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock;

s.  Failing to request and arrange for timely medical attention when it was known Mr. Hehrer was unresponsive and/or suffering from symptoms related to hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock;

t.  Failing to maintain complete and accurate medical records;

u.  Failing to follow protocols for the management and treatment of inmates suffering from symptoms related to hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock;

v.  Failing to properly monitor Mr. Hehrer while he was suffering from symptoms related to hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock;

w. Failing to intervene and to prevent the ongoing constitutional violations against Mr. Hehrer by Clinton County Defendants and/or other ACH Defendants, where Defendants had numerous and reasonable opportunities to intervene, and;

x.  Any other wrongful acts and/or omissions that become known through the course of discovery.

201.   As a direct and proximate result of the wrongful conduct of each of the individual Jail Medical Defendants, Plaintiff has been substantially and irreparably injured. These injuries to Mr. Hehrer and his Estate include, but are not limited to:

    a.  Hyperglycemia;

    b.  Hypothermia;

    c.  Diabetic ketoacidosis;

    d.  Septic shock;

    e.  Mr. Hehrer's severe and inhumane emotional and mental pain and suffering;

    f.  Shock, fright, and humiliation;

    g.  Prolonged hospital stay due to complications from injury;

    h.  Conscious pain and suffering;

    i.  Loss of society and companionship of the heirs of the Estate;

    j.  Great pain, emotional and psychological distress of the heirs of the Estate;

    k.  Loss of support and earning capacity;

    l.  Medical expenses;

    m. Funeral and burial expenses; and

n. Any additional damages that become known through discovery and available under Michigan and federal law pursuant to 42 U.S.C. §§ 1983 and 1988.

## COUNT VII

## FAILURE TO TRAIN, FAILURE TO SUPERVISE, AND INADEQUATE POLICIES, PROCEDURES, CUSTOMS AND PRACTICES - DELIBERATE INDIFFERENCE

## VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 USC §1983 (MONELL CLAIM – CLINTON COUNTY)

## DEFENDANTS

## CLINTON COUNTY, CLINTON COUNTY SHERIFF LAWRENCE JERUE, JAIL ADMINISTRATOR THOMAS WIRTH, SERGEANT SARAH FAGGIONS, SERGEANT JAMES BURDICK, SERGEANT CHAD BASHORE, SERGEANT RICHARD STOUT

202. Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one (1) through two hundred one (201) as if fully set forth herein.

203. 42 U.S.C. § 1983 states:

Every person, who under the color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress ...

Attorneys & Counselors at Law

VAHDAT WEISMAN LAW

V|W

204. Defendants Clinton County, Clinton County Sheriff Lawrence Jeure, Jail Administrator Thomas Wirth, Sergeant Sarah Faggions, Sergeant James Burdick, Sergeant Chad Bashore, and Sergeant Richard Stout (hereinafter "Jail Official Defendants"), had an obligation to supervise, monitor and train their agents and employees, including Defendant Officer Corey Becker, Defendants Officers Jane Does 1-2, and Defendants Officers John Does 1-5, to ensure that the Constitutional rights of Mr. Hehrer and similarly situated citizens were not violated.

205. That Defendants Clinton County, Clinton County Sheriff Lawrence Jerue, and Jail Administrator Thomas Wirth, as the final policy-makers for the county, failed to adequately train, staff, report, supervise, monitor, investigate and/or discipline their correction officers and/or medical services personnel, with respect to hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock signs, symptoms, monitoring, and/or indications for medical intervention, leading to the failures as set forth by way of illustration in the Factual Allegations and General Allegations Sections above.

206. That the Jail Official Defendants further adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including such for failing to train and/or supervise their employees/agents, and were the final policy-makers within the Sheriff Department and/or the Clinton County Jail.

207.   That the motivating and moving force for the Jail Official Defendants' conduct as described herein amounted to the deprivation of Mr. Hehrer's Eighth and Fourteenth Amendment Rights were the following unconstitutional official policies, procedures, customs and/or practices:

a.  A policy, custom or practice of failing to provide sufficient correctional and medical health staff for inmates at the Clinton County Jail;

b.  A policy, custom or practice of failing to refer inmates suffering from severe deteriorating health symptoms to licensed acute care facilities and/or hospital settings in a timely manner;

c.  A policy, custom or practice of failing to use appropriate medical interventions to treat inmates while they suffer from health ailments;

d.  A policy, custom or practice of allowing non-licensed individuals to administer medications and/medical treatments to inmates;

e.  A policy, custom or practice of failing to ensure appropriate documentation of medical requests are received by medical personnel;

f.  A policy, custom or practice of failing to follow monitoring guidelines relating to the medical needs of inmates;

g.  A policy, custom or practice of failing to train its employees in the recognition of severe, progressive, and life-threatening symptoms of

hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock;

i.  A policy, custom or practice of denying inmates at the Clinton County Jail access to appropriate, competent and necessary care for serious medical needs;

j.  A policy, custom or practice of failing to provide adequate supervision to assist medical personnel;

k.  A policy, custom or practice of discouraging transferring inmates to a licensed acute care facility and/or hospital for medical care;

l.  A policy, custom or practice of failing to enforce and follow The Contract terms requiring that Defendant, Clinton County, employ correctional staff, including Defendant Officer Corey Becker, Defendants Officers Jane Does 1-2, and Defendants Officers John Does 1-5, who are trained in recognizing the signs and symptoms of hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock;

m. A policy, custom or practice of combining inmates in medical observation cells, inevitably forcing inmates to sleep on the floor be exposed to unknown diseases and/or health risks.

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

n. A policy, custom or practice of failing to adequately monitor Defendant ACH's performance to ensure it met staffing commitments and provided quality health care;

o. A policy, custom or practice of failing to enforce The Contract terms requiring that Defendant Clinton County employ staff in the Clinton County Jail who are regularly trained in recognizing the signs and symptoms of hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock;

p. A policy, custom or practice of failing to train its corrections staff to properly classify inmates of deteriorating health conditions, including failure to train to ask proper follow up screening questions regarding hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock; and

q. Any other policies, customs or practices that become known through the course of discovery.

208.   As a direct and proximate result of the wrongful conduct of each of the individual Defendants due to the Jail Official Defendants' failure to train, failure to supervise, and their inadequate policies, procedures, customs and/or practices, Plaintiff has been substantially and irreparably injured. These injuries to Mr. Hehrer and his Estate include, but are not limited to:

a.  Hyperglycemia;

b.  Hypothermia;

c.  Diabetic ketoacidosis;

d.  Septic shock;

e.  Mr. Hehrer's severe and inhumane emotional and mental pain and suffering;

f.  Shock, fright, and humiliation;

g.  Prolonged hospital stay due to complications from injury;

h.  Conscious pain and suffering;

i.  Loss of society and companionship of the heirs of the Estate;

j.  Great pain, emotional and psychological distress of the heirs of the Estate;

k.  Loss of support and earning capacity;

l.  Medical expenses;

m. Funeral and burial expenses; and

n.  Any additional damages that become known through discovery and available under Michigan and federal law pursuant to 42 U.S.C. §§ 1983 and 1988.

**COUNT VIII**

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

## FAILURE TO SCREEN, FAILURE TO TRAIN, FAILURE TO SUPERVISE, AND INADEQUATE POLICIES, PROCEDURES, CUSTOMS AND PRACTICES - DELIBERATE INDIFFERENCE

## VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 USC §1983 (MONELL CLAIM – ADVANCED CORRECTIONAL HEALTHCARE)

209.  Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one (1) through two hundred eight (208) as if fully set forth herein.

210.  That prior to and during the period of Mr. Hehrer's incarceration at Clinton County Jail, Defendant ACH was responsible for providing medical and health care services to inmates, including Mr. Hehrer, pursuant to its Contract with Defendant Clinton County and/or Defendant Jerue.

211.  That Defendant ACH is and was a private corporation and pursuant to its Contract with Defendant Clinton County Jail performed a traditional state function of providing medical services to prison inmates, including Mr. Hehrer, and therefore acted under the color of state law.

212.  That pursuant to the Contract, Defendant ACH provided the following pertinent services in the Clinton County Jail, which are not inclusive of all services provided under the Contract:

    a.  Intake screening/assessment of all inmates;

    b.  Comprehensive health evaluations;

c.  Regularly scheduled health-complaint sick calls;

d.  Regularly scheduled nursing coverage;

e.  Regularly scheduled physician hours at Clinton County Jail, and perpetual on-call physician staffing for Clinton County Jail;

f.  Medication administration;

g.  Medical records management; and

h.  Pharmaceutical services;

213.  That Defendant ACH adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including such for failure to properly staff, screen, train, and/or supervise the conduct described herein, such that same amounted to policies which de-humanized inmates, including Mr. Hehrer, and led to deliberate indifference to Mr. Hehrer's serious medical needs.

214.  That Defendant ACH's policies and procedures implemented the delivery and coordination of said medical services to inmates, including Mr. Hehrer, and were deliberately indifferent to Mr. Hehrer's serious medical needs in that said policies did not ensure that his symptoms of hyperglycemia, hypothermia, diabetic ketoacidosis, and/or septic shock were timely and adequately treated, and did not ensure that medical care would be carried out as requested and/ordered by qualified medical personnel.

215. That these facts, along with the Factual Allegations and General Allegations Sections, and the acts and omissions against the individual ACH Defendants plausibly allege both that Mr. Hehrer's constitutional rights were violated and that Defendant ACH's policy and/or custom of failing to staff, screen, train and/or supervise its employees were a "moving force" behind the deprivation of Mr. Hehrer's Eighth and Fourteenth Amendment Rights to be free from inhumane treatment while incarcerated.

216. Further, that the motivating and moving force for Defendant ACH's conduct as described herein amounted to the deprivation of Mr. Hehrer' Eighth Amendment Rights, were the following unconstitutional official policies, procedures, customs and/or practices of Defendant ACH:

    a. A policy, custom or practice of failing to provide sufficient medical health staff for inmates at the Clinton County Jail;

    b. A policy, custom or practice of failing to refer inmates suffering from severe symptoms of hyperglycemia, hypothermia, diabetic ketoacidosis and/or septic shock to licensed acute care facilities and/or hospital settings in a timely manner;

    c. A policy, custom or practice of failing to follow monitoring guidelines relating to the symptoms of hyperglycemia, hypothermia, diabetic ketoacidosis and/or septic shock;

87

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

d.  A policy, custom or practice of failing to train its employees in the recognition of severe, progressive, and life-threatening symptoms of hyperglycemia, hypothermia, diabetic ketoacidosis and/or septic shock;

e.  A policy, custom or practice of failing to train Defendant Clinton County employees, in the recognition of severe, progressive and life-threatening symptoms of hyperglycemia, hypothermia, diabetic ketoacidosis and/or septic shock;

f.  A policy, custom or practice of failing to discipline or reprimand employees who do not follow company policies and/or standards that put inmates' health at risk;

g.  A policy, custom or practice of denying inmates at the Clinton County Jail access to appropriate, competent and necessary care for serious medical needs;

h.  A policy, custom or practice of failing to provide adequate supervision to assist medical personnel;

i.  A policy, custom or practice of denying Clinton County Jail inmates necessary medical care;

j.  A policy, custom or practice of discouraging transferring inmates to a licensed acute facility and/or hospital for medical care;

88

Attorneys & Counselors at Law

VAHDAT WEISMAN
LAW

V|W

k.  A policy, custom or practice of failing to enforce and follow The Contract terms requiring Defendant ACH to tailor and adopt policies and procedures for health care at the Clinton County Jail, and to provide those policies and procedures to Defendant Clinton County employees and officials, said policies and procedures were to be consistent with the standards set forth by The Contract;

l.  A policy, custom or practice of failing to adequality monitor Defendant ACH's performance to ensure it met staffing commitments and provided quality health care;

m.  A policy, custom or practice of failing to accurately chart and/or record medical observations;

n.  A policy, custom or practice of failing to maintain accurate medical records, including notating all observations relating to medical conditions; and

o.  Any other policies, customs or practices that become known through the course of discovery.

217.  As a direct and proximate result of the wrongful conduct of Defendant ACH's failure to screen, failure to train, failure to supervise and their inadequate policies, procedures, customs and/or practices, Plaintiff has been substantially and

irreparably injured. These injuries to Mr. Hehrer and his Estate include, but are not limited to:

    a.  Hyperglycemia;

    b.  Hypothermia;

    c.  Diabetic ketoacidosis;

    d.  Septic shock;

    e.  Mr. Hehrer's severe and inhumane emotional and mental pain and suffering;

    f.  Shock, fright, and humiliation;

    g.  Prolonged hospital stay due to complications from injury;

    h.  Conscious pain and suffering;

    i.  Loss of society and companionship of the heirs of the Estate;

    j.  Great pain, emotional and psychological distress of the heirs of the Estate;

    k.  Loss of support and earning capacity;

    l.  Medical expenses;

    m. Funeral and burial expenses; and

    n.  Any additional damages that become known through discovery and available under Michigan and federal law pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor and against Defendants, jointly and severally, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) exclusive of costs, interest and attorney fees.

**<u>A JURY TRIAL IS HEREBY DEMANDED</u>**

Respectfully submitted,

VAHDAT WEISMAN LAW

*/s/ Kara E. Weisman*
KARA E. WEISMAN (P80837)
Counsel for Plaintiff
17197 N. Laurel Park Drive, Ste. 500
Livonia, MI 48152
(734) 469-4994; Fax: (313) 451-9719
kara@thevwlaw.com

Dated:  November 9, 2020