UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RHONDA HEHRER,
as Personal Representative
of the Estate of Joseph Hehrer, deceased,

           Plaintiff,          Case No. 1:20-cv-1079

v.                                  Hon. Janet T. Neff

CLINTON COUNTY, *et al.*,

           Defendants.
_____/

## REPORT AND RECOMMENDATION

Joseph Hehrer ("Mr. Hehrer") died on March 13, 2019, from multisystem organ dysfunction due to diabetic ketoacidosis (DKA).[1] Plaintiff, the personal representative of Mr. Hehrer's Estate, alleged that defendants Wendy Lynn Freed, L.P.N., Daryl Tucker Parker, M.D., and Dawn Thelen, L.P.N. (collectively the "ACH defendants") committed medical malpractice in treating Mr. Hehrer while he was a detainee at the Clinton County Jail. Count II is directed at LPN Freed and Count III is directed at LPN Thelen. *See* Third Amend. Compl. (ECF No. 59, PageID.1008-1014). This matter is now before the Court on defendants LPN Freed and LPN Thelen's combined "Motion to strike plaintiff's nursing expert, [LPN] Kimberly Steiner's testimony and/or motion for summary judgment on the merits of plaintiff's medical malpractice claims" (ECF No. 121).

---

[1] *See* Death Certificate (ECF No. 126-12).

1

## I. Background

Plaintiff brought the medical malpractice claims pursuant to this Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367. "A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc. v. United States Trotting Association*, 174 F.3d 733, 741 (6th Cir. 1999). Under Michigan law, "[i]n a medical malpractice case, plaintiff bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Wischmeyer v. Schanz*, 449 Mich. 469, 484; 536 N.W.2d 760 (1995) (footnote omitted). "Failure to prove any one of these elements is fatal." *Id.* Michigan courts recognize "that in medical malpractice cases issues of negligence and causation are normally beyond the ken of laymen." *Thomas v. McPherson Community Health Center*, 155 Mich. App. 700, 705; 400 N.W.2d 629 (1986). Accordingly, "expert testimony is required to establish the applicable standard of conduct, the breach of that standard, and causation." *Id*.

As an initial matter, the Court looks to three evidentiary rules related to expert witnesses. Fed. R. Evid. 601 ("Competency to testify in general") provides that,

> Every person is competent to be a witness unless these rules provide otherwise. But in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision.

Next, Fed. R. Evid. 702 ("Testimony by expert witnesses") states,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (eff. Dec. 1, 2023).

As interpreted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), "Rule 702 grants district courts 'discretion in determining whether . . . a proposed expert's testimony is admissible, based on whether it is both relevant and reliable.'" *Wilden v. Laury Transportation, LLC*, 901 F.3d 644, 649 (6th Cir. 2018).

> The Supreme Court has identified several non-exclusive factors that lower courts may consider in assessing reliability: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a high known or potential rate of error; and (4) whether the technique enjoys general acceptance within the relevant scientific, technical, or other specialized community.

*Id*. (citing *Daubert*, 509 U.S. at 593-94).

Finally, Fed. R. Evid. 703 ("Bases of an expert's opinion testimony") provides that,

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

In applying these rules, the Sixth Circuit explained that,

> Rule 601 deals with the witness's *competency*, which makes it essentially substantive (because it is "intimately intertwined" with the substantive law), whereas Rule 702 (as interpreted by *Daubert*) is truly a measure of *qualification*, as it is directed at the science and methodology behind the witness's testimony, and is therefore a procedural issue.

*Legg v. Chopra*, 286 F.3d 286, 291 (6th Cir. 2002) (emphasis in original).

"Where a state has provided by statute certain competency criteria for expert witnesses in medical malpractice actions, the federal court sitting in diversity is required to apply the state competency rules pursuant to Rule 601." *Slifcak v. N. Michigan Hospitals, Inc.*, No. 1:90-cv-565, 1991 WL 626469 at *2 (W.D. Mich. Aug. 20, 1991). Accordingly, in a medical malpractice action brought under Michigan law, "Rule 601 of the Federal Rules of Evidence requires this Court to apply the state competency rule, M.C.L.A. § 600.2169; M.S.A. § 27A.2169, in determining whether a medical specialist is competent to testify on the appropriate standard of care." *Id.*

In summary, in a Michigan medical malpractice case, "M.C.L. § 600.2169 speaks to the professional competency an expert witness must possess in order to testify regarding standard of care issues" under state law, and Fed. R. Evid. 702 "speaks to the science and methodology behind an expert's opinions". *Campbell v. United States*, No. CV 19-12383, 2020 WL 9349618 at *7 (E.D. Mich. Nov. 23, 2020).

In a medical malpractice case brought in state court, the Michigan Supreme Court has stated that, "[t]he proponent of expert testimony in a medical malpractice case must satisfy the court that the expert is qualified under MRE 702, MCL 600.2955 and MCL 600.2169." *Clerc v. Chippewa County War Memorial Hospital*, 477 Mich. 1067, 1067; 729 N.W.2d 221 (2007).

In Michigan, the admissibility of expert witness testimony is governed by MRE 702, the state's counterpart to Fed. R. Evid. 702, which provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

4

*Edry v. Adelman*, 486 Mich. 634, 639; 786 N.W.2d 567 (2010). "MRE 702 incorporates the standards of reliability that the United States Supreme Court described to interpret the equivalent federal rule of evidence in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Id*.

For purposes of a medical malpractice case, the state trial court, acting as a "gatekeeper" under MRE 702, considers all of the factors shown in M.C.L. § 600.2955(1).[2] *Clerc*, 477 Mich. at 1067-68. "If applicable, the proponent must also satisfy the requirement of MCL 600.2955(2) to show that a novel methodology or form of scientific evidence has achieved general scientific acceptance among impartial and disinterested experts in the field."[3] *Id*. at 1068.

Because this medical malpractice claim is brought in federal court, Michigan's procedural rules for expert testimony, MRE 702 and M.C.L. § 600.2955, do not apply. Rather, the

---

[2] M.C.L. § 600.2955(1) provides:

"(1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

    (a) Whether the opinion and its basis have been subjected to scientific testing and replication.
    (b) Whether the opinion and its basis have been subjected to peer review publication.
    (c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.
    (d) The known or potential error rate of the opinion and its basis.
    (e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.
    (f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.
    (g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation."

[3] M.C.L. § 600.2955(2) provides, "(2) A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field."

5

science and methodology behind the doctor's testimony are evaluated under Fed. R. Evid. 702. *See Legg*, 286 F.3d at 29.

However, Michigan's state competency rule, M.C.L. § 600.2169, applies as a matter of substantive law. Here, the relevant portion of the statute is M.C.L. § 600.2169(1)(a) which states that,

> In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:
>
> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.

### II. Motion to strike LPN Steiner's testimony

Defendants seek to strike LPN Steiner's expert testimony on the standard of care. Defendants contend that LPN Steiner lacked familiarity with the local standard of care for LPNs working in Michigan and testified only to what she would do to comply with the standard of care. Defendants' objection involves the Court's gatekeeper role under *Daubert* as to what expert testimony can be presented to a jury and what testimony must be excluded. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (extending gatekeeping function to all expert testimony). The Court must determine "whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case." *Id*. at 156 (internal quotation marks omitted).

As the court explained in *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012):

A district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). One key consideration is "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id*. at 592-93, 113 S.Ct. 2786. The inquiry is "a flexible one," and "[t]he focus . . . must be solely on principles and methodology, not on the conclusions they generate." *Id*. at 594-95, 113 S.Ct. 2786. An expert who presents testimony must "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Here, defendants submit that,

By her own testimony, LPN Steiner lacks any familiarity with the local standard of care applicable to LPNs working in the correctional setting within the State of Michigan. Accordingly, consistent with MCL. 600.2912a, as well as the holdings of [*Cox ex rel. Cox v. Board of Hospital Managers for City of Flint*, 467 Mich. 1, 651 N.W.2d 356 (2002)] and [*Decker v. Rochowiak*, 287 Mich. App. 666, 791 N.W.2d 507 (2010)] LPN Steiner has failed to establish a familiarity with the local standard of care and is therefore not qualified to offer standard of care testimony in this matter.

Defendants' Brief (ECF No. 121, PageID.3284). Defendants further state that,

Additionally, Ms. Steiner admitted that her opinion that LPNs Freed and Thelen should have chosen to do something different than what their doctor ordered them to do, such as use a glucometer or a urine dipstick, is based upon what she would do depending upon orders she might receive from her supervising doctor, and that every doctor's orders and protocols for nurses are not the same. ([LPN Steiner Dep.] at pp. 28, Lines 108:18 to 110:1 [ECF No. 121-1, PageID.3322-3323] . . . .

Essentially, Ms. Steiner testified that the only standard of care that she knows is to follow the doctor's orders, which is what LPNs Freed and Thelen did.

Defendants' Brief at PageID.3284-3285 (emphasis in original).

As an initial matter, M.C.L. § 600.2912a[4] does not apply to LPNs Freed and Thelen.

"Michigan has defined statutory criteria for proving the standard of care for a physician in general

---

[4] *See* M.C.L. § 600.2912a(1), which provides in pertinent part that:

"in an action alleging malpractice, the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:

7

or specialist practice, *see* Mich. Comp. Laws 600.2912a, but that provision 'by its plain language, does not apply to nurses.'" *Redmond v. United States*, 194 F. Supp. 3d 606, 622 (E.D. Mich. 2016) (citing *Cox*, 467 Mich. at 18). "Accordingly, the applicable standard of care in a malpractice action involving a nurse is the skill and care ordinarily possessed and exercised by practitioners of the profession in the same or similar localities." *Id*. citing *Cox*, 467 Mich. at 21-22 (internal brackets and quotation marks omitted).

Here, Nurse Steiner has been an LPN since 1983. LPN Steiner Dep. (ECF No. 121, PageID.3301). She became a certified correctional healthcare provider (CCHP) in 2011, which required her to learn the national nursing standards. *Id*. at PageID.3301, 3304. LPN Steiner (who works in Georgia) testified that her approach to medical care for an inmate in Georgia would be the same as in Michigan because "[t]hey are national standards." LPN Steiner Dep. (ECF No. 121-1. PageID.3302, 3324).[5] In short, LPN Steiner's testimony is that the national standard applies to LPNs when treating inmates in a correctional facility, whether it is in Georgia or Michigan.

Assuming that LPN Steiner's testimony is based solely on her experience, "neither *Daubert* nor its progeny preclude experience-based testimony . . . nor do they prohibit trained

---

(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice or care in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.
(b) The defendant, if a specialist, failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury."

[5] LPN's Steiner's cited testimony appears at p. 113 of her deposition:

Q. Nurse Steiner, as an LPN would your approach to medical care for an inmate be the same here in Georgia as it would be in Michigan?
A  Yes.
\*\*\*
A  Yes. They are national standards.

LPN Steiner Dep (ECF No. 121-1, PageID.3323)..

experts from forming conclusions by extrapolating from existing data." *Butler v. First Acceptance Ins. Co.*, 652 F. Supp. 2d 1264, 1272 (N.D. Ga. 2009) (citing *Kumho*, 526 U.S. at 151 and *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)). However, "[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (quoting Fed. R. Evid. 702 advisory committee's note (2000 amendments)). LPN Steiner must connect her experience with the specific facts of this case. "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and *how* that experience is reliably applied to the facts." *Id*. (quoting Fed. R. Evid. 702 advisory committee's note (2000 amendments.) (emphasis added). In this regard, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. *See, e.g.*, *Tobin v. Providence Hospital*, 244 Mich. App. 626, 667, 624 N.W.2d 548 (2001) ("The question whether an expert's testimony established the proper standard of care (i.e., community or national) is a matter that is determined on the basis of the testimony offered by the expert at trial."). While defendants raise matters which could form the basis of a vigorous cross-examination at trial, these are not sufficient to strike LPN Steiner's testimony as part of this motion for summary judgment. Accordingly, for these reasons, defendants' motion to strike LPN Steiner's testimony should be denied.

### III. Motion for summary judgment

#### A. Standard of review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B. Discussion

#### 1. Defendants contend that LPN Steiner does not dispute that LPN Freed and LPN Thelen's actions were appropriate

Defendants contend that plaintiff cannot carry her burden of proof against LPN Freed and LPN Thelen because her expert, LPN Steiner, "cannot reliably point to any definitive violation of the applicable standard of care." Defendants' Brief at PageID.3289. As an initial matter, defendants make the general statement that "[a]ny proposed opinions by LPN Steiner that

LPNs Freed and Thelen violated the applicable standard of care are nothing but *ipse dixit* testimony completely disconnected from the facts as LPN Steiner understands them and even her own explanation of the standard of care." *Id*. at PageID.3288.[6] As discussed in § II., *supra*, LPN Steiner can testify based on her experience.

At her deposition, LPN Steiner testified that she reviewed records, including the deposition transcripts of LPN Freed and LPN Thelen. LPN Steiner Dep. at PageID.3298. Steiner testified that one standard of care "requires an LPN to accurately chart and document a patient's medical record" and that another "standard of care for an LPN requires you to check on an inmate in medical observation in a timely manner." *See* Steiner Dep. at PageID.3316, 3318. *See also*, Plaintiff's Response (ECF No. 126, PageID.3727) (citing Steiner Dep. at pp. 84:15-85:10 and 92:25-93:5). Based on her review of the record, LPN Steiner concluded that LPN Freed and LPN Thelen breached the standard of care:

> Q     As we sit here today, from all the records you've reviewed and the testimony, is it still your opinion that Nurse Freed and Nurse Thelen breached the standard of care?
>
> A     Yes.

LPN Steiner Dep. at PageID.3324.

Defendants dispute the factual basis for LPN Steiner's opinion by setting out eight sentences in which they summarize LPN Steiner's 116-page deposition testimony. With respect to LPN Freed, defendants stated:

> LPN Freed was informed twice that Mr. Hehrer was not feeling well, on March 6, 2019 and March 8 2019. (Ex. A [LPN Steiner Dep. ECF No. 121-1] at pp. 11, lines 39:10 to 40:7, 40:22 to 41:4).

---

[6] *See Black's Law Dictionary* (10th ed. 2014) (defining "ipse dixit" as "[s]omething asserted but not proved.").

11

> On both March 6 and 8, LPN Freed saw Mr. Hehrer, assessed his condition, reported that condition to Dr. Parker, received orders from Dr. Parker and followed them. (*Id* at pp. 11, lines 38:11 to 39:2; 14, lines 52:7 to 53:2)
>
> On March 6, 2019, Nurse Freed "did what she should have done on that day as far as notifying the doctor." (*Id*. at 105:4-5).
>
> There is no documentation that when LPN Freed last checked on Mr. Hehrer at approximately 1400 on March 8, 2019, he was in any kind of medical distress. (*Id* at pp. 14-15, lines 54:13 to 55:7).
>
> There was no documentation in the medical records that Mr. Hehrer had any signs or symptoms of excessive thirst, excessive urination, blurred vision, shortness of breath, shacking or trembling, sweating or chills, dizziness or lightheadedness, or was unable to stand up or walk. (*Id*. at 15, Lines 55:15-57:8).

Defendants' Brief at PageID.3287-3288.

With respect to LPN Thelen, defendants stated:

> LPN Thelen was only involved in Mr. Hehrer's care for a few hours on the morning of March 9, 2019. (*Id*. at 17, lines 65:4 to 65:22).
>
> There is no documentation that prior to seeing Mr. Hehrer on the morning of March 9, 2019, L.P.N. Thelen was aware Mr. Hehrer was in any type of medical distress. (*Id*. at 17-18, lines 65:19 to 67:11).
>
> There is no evidence that when LPN Thelen arrived at the jail on March 9, 2019 other inmates advised her of an urgent need to see Mr. Hehrer. (*Id*. at pp. 18, lines 68:5 to 68:10)

Defendants' Brief at PageID.3288.

Plaintiff's response makes unsupported statements that both LPN Freed and LPN Thelen breached the standard of care because "[b]oth failed to correctly document observations of Mr. Hehrer vomiting" and "[b]oth failed to timely check-on Mr. Hehrer and failed to adequately monitor a patient that was in medical observation." Plaintiff's Response at PageID.3727.

Plaintiff did not address LPN Steiner's testimony with respect to LPN Thelen. Plaintiff did point out portions of LPN Steiner's testimony as it related to LPN Freed:

12

> Moreover, Nurse Freed failed to administer medication as ordered by the treating physician. Nurse Steiner testified, "…So on the 6th, Zofran was ordered twice a day for three days, which would have been the 6th, 7th, 8th, even if not the 6th morning, that p.m., 6:00 p.m. The record doesn't indicate that he received any Zofran." (*Id.*, p. 41: 20- p. 42: 8). She further testified, "…On the 7th, it doesn't look like he received any Zofran on that day either. His first dose was given on the 8th, morning, according to MAR." *Id*. L 11-13; Nurse Steiner reiterated "if it's not documented it wasn't done is the standard". *Id*. L 18-19; [sic]

*Id*. at PageID.3727-3728. (citing LPN Steiner Dep. at PageID.3305-3306).

Based on this record, plaintiff did not point to any testimony from LPN Steiner to establish that LPN Thelen breached a standard of care during her brief interaction with Mr. Hehrer on March 9, 2019.  Plaintiff did, however, point out LPN Steiner's testimony that LPN Freed breached a standard of care based upon Freed's failure to administer and document Zofran on March 6, 7 and 8, 2019.  A genuine issue of material fact exists as to whether LPN Freed committed malpractice.  Accordingly, LPN Thelen's motion for summary judgment should be granted on this ground and LPN Freed's motion for summary judgment should be denied on this ground.

### 2. Defendants contend that LPN Freed's alleged breaches did not cause Mr. Hehrer's death.

Defendants also seek summary judgment "because Plaintiff cannot establish that any of their alleged breaches caused Mr. Hehrer's death or changed his outcome."  Defendants' Brief at PageID.3289.  In this regard, defendants contend that plaintiff's causation expert, Dr. Levin, could not say what any additional testing would have shown, could not testify that Dr. Parker or the ACH defendants' treatment caused Mr. Hehrer's death, and could not testify that Hehrer was in DKA prior to March 9, 2019.   *Id*. at PageID.3289-3290.

The Court previously denied defendant Dr. Parker's motion to strike Dr. Levin's testimony on causation.  *See* Order (ECF No. 143).  In responding to that earlier motion, plaintiff set out portions of Dr. Levin's testimony regarding Mr. Hehrer's condition before he was sent to

13

the hospital. *See* Plaintiff's Response (ECF No. 128, PageID.7755-7756). Dr. Levin's opinions included the following:

> Q. Okay. My question is very specific, though. I'm not – I'm asking you about the 8th. Forget about what they did or didn't do. I'm asking you, are you able to tell us, as we sit here today, that on March the 8th, Mr. Hehrer was in a condition such that he was going to die if he was not sent to the hospital and that he had diabetic ketoacidosis basically?
>
> MR. CIESLAK [Plaintiff's counsel]: Form. Foundation.
>
> BY MR. SCARBER [Defendants' counsel]:
> Q. And you can't tell us that, can you?
>
> A. I can -- I can say that based on his symptoms, including the very rapid pulse up to 130 now, based on his dry skin, based on the weight loss, according to them, based on days and days of throwing up and throwing up and throwing up and being very dehydrated, that at that point he was in grave danger. And at that point, if that wasn't treated quickly, the high probability was certainly more than 51 percent, that he would deteriorate into a life threatening situation. And I think that's what it was. He was at high risk. They didn't pick it up and he deteriorated.

Dr. Levin Dep. (ECF No. 128-1, PageID.7807-7808).

Defendants point out that their own endocrinology and proximate cause expert, Dr. Schnall, testified that DKA does not go away for two days or 36 hours, and then come back, which would demonstrate that Mr. Hehrer was not in DKA between March 5, 2019 and March 8, 2019 and why it would not be suspected. *Id*. at PageID.3290-3291.

In addition, defendants apparently contend that Mr. Hehrer died from a procedure at Sparrow Hospital, when "on March 9, 2019, at approximately 9:30 p.m., while at Sparrow Hospital, the medical records plainly state that the central line was inadvertently placed into Mr. Hehrer's jugular vein, causing severe damage resulting in his death." *Id*. at PageID.3291. In support of their contention, defendants cite some of the "Hospital Course" portion of the hospital's death summary for Mr. Hehrer. *Id*. This portion of the death summary reads as follows:

> Joseph Hehrer is a 26 y/o male with no known PMHx who presents to Sparrow Hospital on 3/9 from jail after he has been coughing up blood since 48 hours PTA. Pt could answer questions, but seems to be a poor historian. Pt complains of associated SOB, recent weight loss, and feeling ill for the past 5 days. No chest pain/trauma. No recent travel/sick exposure. Pt has been in jail for 50 days. Per patient, he does not have any previous diagnosis of diabetes. Patient denies taking any illicit drugs or alcohol. Patient was released from jail and immediately brought to the ED via EMS.
>
> In the ED, the patient was hypotensive and hypothermia with AMS. BS >700. ABG 7.01/14/154/3.4, AG of 25, BUN 80, Cr 2.93, positive serum ketones. WBC 21.2, Hb 10.8, PLT 148. Vanc and cefepime started. 2L IV bolus given. Patient was then transferred to the ICU for further medical management of DKA.
>
> Once in the ICU, the patient became hypotensive despite extensive fluid resuscitation and was started on levophed. He was noted to be in severe metabolic acidosis and was given 2 amps of bicarb. A central line was attempted for pressure support medication administration, but there was concern for arterial placement and the line was withdrawn. Following this, the patient became increasingly altered and hypotensive. Anesthesia was called for emergent intubation. The patient's pupils were reactive, but unequal. A follow-up carotid ultrasound showed no damage to the ICA, however, a R IJ thrombus was noted. Stroke team was immediately called to evaluate the patient. A CT scan showed concern for multiple infarcts suggesting global hypoperfusion/hypoxemic event. A follow up brain MRI confirmed these findings and suggested progression of the infarctions with mass effect upon the 4th ventricle. Hypertonic saline was started and Neurosurgery was consulted. Over the next three days following admission, the patient was off of sedation without showing signs of purposeful movement. Brainstem functions were preserved, however, the patient had decorticate posturing with withdrawal from pain in upper extremities only. Ultimately, the patient's family decided to make the patient comfort care as the patient's wishes would not be aligned with on-going interventions such as tracheostomy, feeding tube, or dialysis.

Medical Records (ECF No. 121-8, PageID.3638-3639).

Defendants' expert Dr. Schnall testified that the injury at the hospital was not due to DKA stating,

> Q. You talked about some things that occurred, quite a few things that occurred while Mr. Hehrer was being treated at Sparrow Hospital. I want to ask you about a couple of things that you mentioned. You talked about this issue that occurred with the central line?
>
> A. Right.

15

Q. Can you tell us exactly from your review of the record what occurred with the central line?

MS. WEISMAN [Plaintiff's counsel]: Objection; asked and answered.

THE WITNESS: Yes. There was a problem at 2030 meaning 8:30 at night. The nurse wrote a note saying there were problems with the doctor attempting to place the central line in the right side of Mr. Hehrer's neck and at 2045, 15 minutes later, the nurse noted Mr. Hehrer had lost consciousness. Before that, he was awake and talking and responding normally, but within that very short period of time, he became unresponsive and he never recovered consciousness.

BY MR. SCARBER [Defendants' counsel]:

Q. So let's talk about that. There's a point in the medical records you say that demonstrates that Mr. Hehrer had what sounds like a permanently impaired cognitive capacity?

A. Yes.

Q. At what point was that?

A. Well, it was 3-9, March the 9th at about 2045 o'clock.

Q. And according to the records, did that occur as a result of DKA or did that occur as a result of putting something -- puncturing his main artery when putting in the central line?

MS. WEISMAN: Objection; foundation; asked and answered.

THE WITNESS: They did not puncture his artery. It was his vein, the jugular vein and that was not due to DKA, no way.

Dr. Schnall Dep. (ECF No. 121-7, PageID.3630.

Plaintiff does not explicitly respond to defendants' arguments regarding Dr. Schnall's opinion or Mr. Hehrer's death at the hospital. Plaintiff does present a counter-statement of facts which include, among other things, a 1,590 page exhibit of the EMS records and hospital treatment records, and a copy of Mr. Hehrer's death certificate indicating the cause of death as multisystem organ dysfunction due to DKA. *See* Plaintiff's Response (ECF No. 126, PageID.3720-3726); Exhibits (ECF Nos. 126-11 and 126-12, PageID.3987-5578).

16

Based on this record, the Court concludes that genuine issues of material fact exist as to whether LPN Freed's alleged breaches of the standard of care caused Mr. Hehrer's death at the hospital. In addition, plaintiff and defendant each have an expert witness on the issue of causation, with plaintiff's expert indicating that Mr. Hehrer's condition deteriorated into a life-threatening situation at the jail due to the failure to treat DKA, and defendant's expert indicating that Mr. Hehrer's injury at the hospital was not due to DKA. "The proper resolution of the battle of the experts is for the jury, which will inevitably weigh the experts' testimony and decide accordingly." *Magna Electronics, Inc. v. TRW Automotive Holdings Corp.*, No. 1:12-cv-654, 2016 WL 4239185 at *2 (W.D. Mich. Jan. 7, 2016) (citing *Scallon v. U.S. AG Center, Inc.*, 42 F. Supp. 2d 867, 870 (N.D. Iowa 1999) ("[T]he 'battle of the experts' also goes to the weight of [the experts'] testimony.")). Accordingly, defendants' motion for summary judgment should be denied on this ground.

## IV.   RECOMMENDATION

For these reasons, I respectfully recommend that defendants LPN Freed and LPN Thelen's combined motion to strike LPN Steiner's testimony and for summary judgment (ECF No. 121) be **DENIED** to the extent it seeks to strike LPN Steiner's testimony.

I further recommend that the combined motion be **DENIED** to the extent it seeks summary judgment for plaintiff's claims against LPN Freed in Count II.

I further recommend that the combined motion be **GRANTED** to the extent it seeks summary judgment for plaintiff's claims against LPN Thelen in Count III, and that LPN Thelen be dismissed from this case.

Dated:  August 23, 2024                          /s/ Ray Kent
                                                 RAY KENT
                                                 United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).